**SEMMES MOTORS, INC.,** suing on behalf of itself and together with Ford Dealers Alliance, Inc., etc., et al., Plaintiffs-Appellees,

v.

**FORD MOTOR COMPANY,** Defendant-Appellant.

Nos. 861 and 862, Dockets 34447 and 34671.

United States Court of Appeals, Second Circuit.

Argued May 28, 1970.

Decided July 6, 1970.

Otis Pratt Pearsall, New York City (Hughes, Hubbard & Reed, and John A. Donovan, New York City, of counsel), for defendant-appellant.

David Fisher, New York City (Manes, Sturim, Roth & Fisher, New York City, of counsel), for plaintiffs-appellees, and Wilentz, Goldman & Spitzer, Allen Ravin, Alan E. Davis, Stanley L. Benn, Perth Amboy, N. J., on the brief.

Jerry S. Cohen, Washington, D. C., for National Automobile Dealers Association as amicus curiae.

Margaret Millus Maroldy, New Rochelle, N. Y., for New Jersey Automobile Dealers Association as amicus curiae.

Before WATERMAN, FRIENDLY and FEINBERG, Circuit Judges.

FRIENDLY, Circuit Judge:

This heated controversy, which at this early stage has already produced four and a half printed pages of docket entries in the District Court for the Southern District of New York, not to speak of those in a related action in the District Court for New Jersey, is between defendant Ford Motor Company and plaintiff Semmes Motors, Inc.,

Ford's dealer in the plush suburb of Scarsdale, N. Y., since 1949. Federal jurisdiction is predicated both on diverse citizenship and on the Federal Dealer Act, 15 U.S.C. §§ 1221–1225. Part of the acrimony is doubtless due to the fact that William A. Semmes, president of Semmes Motors, has taken an active part in the formation of Ford Dealers Alliance, Inc., a New Jersey corporation joining as a plaintiff, whose "main purpose," as stated in the complaint, "is the protection of dealers from abuse of the franchise system run by" Ford.[1] Semmes considers Ford's termination of his dealership to be a retaliation for these activities and an endeavor to supplant him with a dealership in which Ford would have a financial stake; Ford rejoins that activities on behalf of dealers, however proper, cannot protect against the consequences of what it characterizes as fraud. We affirm, with a modification stated in section IV of this opinion, the temporary injunction issued by Judge Ryan as being within the discretion afforded him, but order that further proceedings be stayed pending termination of the New Jersey litigation.

## I.

Commencing with the 1965 vehicles, introduced by Ford in the fall of 1964, the manufacturer has made its warranty directly to the retail purchaser as well as to the dealer. When a purchaser of a Ford car finds a defect which he claims to be within the warranty, he returns the car to the dealer who repairs it and submits a Warranty Refund Claim to Ford. The company reimburses the dealer for replacement parts at cost plus a profit and for labor in an amount determined by multiplying the installation time specified in a Ford schedule by the dealer's then approved labor rate. Dealers have complained that deterioration in quality control at the factory, difficulty in securing skilled repairmen, and other elements have made this policy burdensome; Ford has been concerned over the submission of inflated and even wholly false refund claims.

It will suffice to state the facts and the proceedings below in rather summary form: Although there had been a considerable history of dissatisfaction by Ford with Semmes' warranty refund claims,[2] the kick-off for the present fight was an apparently routine letter, dated July 25, 1969, from S. J. Obringer, Ford's New York District Sales Manager, to Semmes. This announced that in accordance with Company policy, Ford auditors would call on him, would "examine warranty claims and their related dealership records, inspect repaired units and may possibly contact customers for whom you have performed warranty work." It continued that the auditors would bring to Semmes' attention "any opportunities they find for improving warranty administration at your dealership," that the audit findings would be discussed with him, and that claims determined to have been improper might be charged back.[3]

The audit was conducted from August 4 through 28; its results were embodied in a report submitted to Semmes on September 18. Not stating the number of

---

1. The district court found there had been no showing of need for temporary injunctive relief on the part of the Alliance and reserved the issue of the propriety of the class action Alliance had sought to initiate.

2. Ford asserts that the reason for its failure to press these earlier was a policy against auditing dealers who were members of the Ford National Dealer Council to which Semmes was elected in February 1968, and that in March 1969 the policy was abandoned.

3. On July 31 the Alliance wrote Obringer, stating *inter alia* that they and Semmes "wish to make it perfectly clear that under no circumstances will representatives of the factory be permitted to call automobile owners or to examine the automobiles of customers." Ford obviously did not accept these self-serving restrictions, which would have had the effect of limiting the audit to errors in Semmes records and inspection of cars that happened to come in during its course.

claims examined or the period covered, the report found that 253 claims submitted by Semmes for refund, with a price tag of $10,440, were defective. The most serious were 86 claims, aggregating $4,691, where the auditors found that work for which reimbursement had been obtained had not been performed at all. Fifty of these were determined by visual inspection of vehicles that had come in during the audit, presumably for some other cause; the inspectors reported that 87% "of the inspectable units checked had work not performed." The other 36 claims were ascertained in the course of questioning "during telephone contacts made in the form of an owner satisfaction survey." Despite these seemingly serious findings, the auditors' recommendations were rather bland: [4] Semmes should consider appointing a shop foreman, and there should be better control of the return of defective parts, of the recording of mechanics' time, and of the status of repairs in the shop.

The auditors' insistence on contacting customers led the Alliance and Semmes to file, on August 22, 1969, a complaint in a New Jersey state court, later removed by Ford to the District Court for New Jersey, seeking an injunction against such contacts. However, no application for interlocutory relief was then made. The New Jersey action came to the attention of Robert W. Scott, an Associate Counsel in Ford's main office in Dearborn, Michigan. Learning of the results of the audit, Scott decided that Ford would have to consider making a counterclaim for false and fraudulent refund claims· and also terminating Semmes' dealership. The meeting promised in Obringer's letter took place on September 18. An affidavit of one of Semmes' attorneys alleges that Semmes requested an opportunity for an independent appraisal, to which

the Ford representatives did not object, and access to certain materials used by the auditors, which was refused. Meanwhile Ford had arranged with its New York attorneys to interview the owners contacted by the auditors and for teams comprised of an attorney, a Ford service representative and an independent expert to conduct further physical inspection of vehicles on which Semmes had submitted Warranty Refund Claims. These inspections began on September 22 and by October 7 had included 105 vehicles; Ford asserts that in 70% of these, repairs claimed by Semmes had not been performed.[5]

On the afternoon of October 7, Ford's New York counsel informed Scott that plaintiffs' New York attorneys had advised them of an intention to file in the Southern District of New York an action on behalf of Semmes and the Alliance substantially identical to the New Jersey action and to seek a temporary restraining order similar to that which had been there refused, see fn. 5. Ford countered by moving on October 8 in the New Jersey action to dismiss Alliance's claim and filing an answer and counterclaim with respect to Semmes. On the same day Judge Ryan, in the Southern District of New York, declined to issue a temporary restraining order against customer contacts pending a hearing on a temporary injunction on October 14.

Meanwhile Scott had been discussing termination of Semmes' dealership with Ford officials in Dearborn, in part, according to him, because of a view that failure to take this step would cast doubt on the sincerity of Ford's counterclaim for fraud. On October 8, a termination notice was signed by the Secretary of Ford and sent to the New York District Sales Office. The next morning Scott cleared this with L. A. Iacocca, Ford's Executive Vice President, and service was made that afternoon. As a

4. As maintained in an affidavit of an Associate Counsel of Ford, this may well have been due to the auditors' restricted view of their responsibilities in the Ford hierarchy.

5. On September 24 Judge Coolahan, in the District Court for New Jersey, declined to issue a temporary restraining order with respect to Ford's investigation.

result, plaintiffs sought and obtained leave to amend their complaint and their request for a temporary injunction in the Southern District to include the termination of Semmes' dealership.

During and after the time this sequence of events was taking place, the District Court became the scene of a flurry of affidavits. Plaintiffs had already filed some on October 8 on the issue of customer contacts. Ford had submitted answering affidavits on that issue on October 13 and, on October 10, had also moved for a stay of proceedings pending determination of the New Jersey action. Voluminous affidavits and exhibits with respect to the temporary injunction against termination were filed by plaintiffs on October 13 and by Ford, after oral argument on October 14, on October 17 and 24.[6] Plaintiffs then responded with a reply affidavit by Semmes, accompanied by exhibits, on October 31.

On November 5, Judge Ryan issued an opinion in which he denied the motion for a stay of the New York action, limited Ford's contacts with Semmes' customers although not to the extent sought by Semmes, and temporarily enjoined termination of the dealership. An injunction order was entered on December 15. On the same day, Ford moved, with elaborate affidavits and exhibits, to vacate the injunction and again to stay proceedings during the pendency of the New Jersey suit. In addition to more material relating to the extent of Semmes' alleged fraud based on further investigation between October 7 and November 5, and an expert statistician's appraisal of its significance, there was an affidavit by George Charney, Semmes' service manager since January 20, 1969, attesting to the regular submission of false claims with William Semmes' knowledge until just prior to the audit. According to the affidavit, dated December 5, 1969, Charney had

confidentially advised Neuhart, a Ford service representative, of this practice in mid-April and Neuhart had made a written report. The report was marked for distribution to the New York District Service Manager, and to the District Manager, Obringer. At the argument of the motion to vacate, Ford sought to explain its previous failure to present affidavits from Neuhart or Charney on the basis that Neuhart's report had been sealed in an envelope marked "Confidential" and placed in the desk of the New York District Service Manager who did not inform Ford's attorneys about it until October 31, 1969. On March 12, 1970, the court denied Ford's motion.

## II.

We must deal at the outset with Ford's contention that the court erred in refusing to stay the New York action until the earlier New Jersey suit had been determined. Since the action was equitable in nature, the denial of the stay would not itself be appealable under 28 U.S.C. § 1292(a) (1) as the denial of an injunction. City of Morgantown v. Royal Ins. Co., Ltd., 337 U.S. 254, 69 S. Ct. 1067, 93 L.Ed. 1347 (1949); Baltimore Contractors, Inc. v. Bodinger, 348 U.S. 176, 75 S.Ct. 249, 99 L.Ed. 233 (1955); 6 Moore, Federal Practice ¶54.07 n. 19 (1966 and 1969 supplement). But when, as here, the district court has granted a temporary injunction so that the court of appeals has unquestioned jurisdiction of the cause, it would be absurd to require the court to close its eyes to another interlocutory order which, though not itself appealable, might infect the entire proceeding with error and thus require reversal after large expenditure of judicial and professional time. Deckert v. Independence Shares Corp., 311 U.S. 282, 286–287, 61 S.Ct. 229, 85 L.Ed. 189 (1940); Barber-Greene Co. v. Blaw-Knox Co., 239 F.2d 774, 776 (6 Cir. 1957); National

---

6. The affidavit of Ford's attorney dated October 17, 1969, alleged that on the basis of the "69.42% Fraud" found by the inspection programs, Semmes had wrongfully received amounts ranging from $55,126 in 1964 to $87,427 in 1968, these comprising from 48% to 106% of its annual net profits.

Equipment Rental, Ltd. v. Fowler, 287 F.2d 43, 45 (2 Cir. 1961); 6 Moore Federal Practice ¶54.08 [1].

■ When the New York complaint was filed, it was in effect a duplicate of that in New Jersey, although the scope of the New Jersey action had been enlarged by Ford's counterclaim to recover warranty refunds allegedly obtained by Semmes through fraud. Later the New York action was broadened to include Semmes' claim to enjoin termination of the dealership. However, F.R.Civ.P. 13(a) required Semmes to file as a counterclaim in the New Jersey action any claim it had against Ford "at the time of serving the pleading," if the claim arose "out of the transaction or occurrence that is the subject matter of the opposing party's claim." Here "the pleading" was the reply, which was required, F.R.Civ.P. 7(a), to be filed within 20 days after October 8, the very day when Semmes' claim of unlawful termination came into being. This clearly "arose out of the same transaction or occurrence" as Ford's counterclaim, under the broad view expressed in the leading case of Moore v. New York Cotton Exchange, 270 U.S. 593, 610, 46 S.Ct. 367, 70 L.Ed. 750 (1926). See Wright, Federal Courts § 79 (1970); 3 Moore, Federal Practice ¶13.13, and, on other points in this discussion, ¶13.08; 3A id. ¶18.04; 1A Barron & Holtzoff, Federal Practice and Procedure (Wright ed.) § 394 at 569 (1960); and Wright & Miller, Federal Practice and Procedure § 1184 (1969). The New Jersey court therefore should be deemed seized of this claim as well. Semmes' attempted distinction of our holding to substantially that effect in *National Equipment, supra*, 287 F.2d at 46 n. 2, on the basis that we were there dealing with a defendant's rather than a plaintiff's failure to file a compulsory counterclaim, is unpersuasive for the reasons stated.

■■ Given this situation, there is no doubt that the New Jersey court could properly have enjoined prosecution of the New York action if Ford had sought this, and might even have been bound to do so. Food Fair Stores, Inc. v. Square Deal Mkt. Co., 88 U.S.App.D.C. 176, 187 F.2d 219 (1951). Instead Ford addressed its argument to the New York court. But we can see no reason why the end result should be different when the party seeking to preserve the primacy of the first court moves the second court to stay its hand rather than asking the first court to enjoin prosecution of the second case. Whatever the procedure, the first suit should have priority, "absent the showing of balance of convenience in favor of the second action," Remington Products Corp. v. American Aerovap, Inc., 192 F.2d 872, 873 (2 Cir. 1951). See Mattel, Inc. v. Louis Marx & Co., 353 F.2d 421, 424 (2 Cir. 1965), where we not only reversed an injunction against prosecution of the first action in New Jersey but ordered a stay of the later action in New York.

We recognize that the instant case differs from the more usual situation where, at least in substance, the plaintiff in the first court is the defendant in the second and *vice versa*. In such instances the plaintiff in the first court is vigorously pressing his desire to proceed in an appropriate forum of his choice and objecting to the defendant's thwarting this by a later suit elsewhere. See, e. g., National Equip., *supra*; Mattel, Inc., *supra*; Gluckin & Co. v. International Playtex Corp., 407 F.2d 177 (2 Cir. 1969). Here the same party is plaintiff in both actions, prefers to press the second, and has stipulated to discontinue the first if defendant will consent.[7] While Ford's fears of parallel litigation in two courts could be stilled if it were willing to consent to plaintiffs' discontinuing the New Jersey ac-

---

7. Because of Ford's counterclaim the New Jersey court could not dismiss the entire action on plaintiffs' motion even if it were more disposed to do so than it seems to be. F.R.Civ.P. 41(a) (2). Although the purpose of this provision was doubtless to prevent a plaintiff's escaping from a counterclaim and that possibility is here precluded by the New York action, the language of the Rule is unqualified.

tion, and Ford has no vested right to be proceeded against in the New Jersey rather than the New York federal court, see Crosley Corp. v. Hazeltine Corp., 122 F.2d 925, 930 (3 Cir. 1941), these factors alone are insufficient grounds for departing from the general rule that in the absence of sound reasons the second action should give way to the first. See Food Fair Stores, Inc. v. Square Deal Mkt. Co., *supra*, 187 F.2d 219.

To begin with, any exception for cases where the same party is plaintiff in both actions would entail the danger that plaintiffs may engage in forum shopping or, more accurately, judge shopping. When they see a storm brewing in the first court, they may try to weigh anchor and set sail for the hopefully more favorable waters of another district. The sequence of events here affords some indication that Semmes might have been attempting to do just that, see fn. 5. The defendant is then put to the Hobson's choice of either going along with this ploy by agreeing to dismissal of the first action if the plaintiff is willing or having to defend two lawsuits at the same time. If he makes the latter election, as is his right, not only the parties but the courts pay a heavy price. "Courts already heavily burdened with litigation with which they must of necessity deal should * * * not be called upon to duplicate each other's work in cases involving the same issues and the same parties," Crosley Corp. v. Hazeltine Corp., *supra*, 122 F.2d at 930. Hence, even when the same party is plaintiff in both actions, the instances where the second court should go forward despite the protests of a party to the first action where full justice can be done, should be rare indeed.

We find no considerations sufficient to justify an exception to the general rule in this case. It is true that if we were free to look at the situation in a vacuum, New York is a more logical fo-

rum than New Jersey. The cause of action "arose" here, Semmes relies in part on a New York statute, and witnesses from Scarsdale and from Ford's New York office would find it more convenient to come to Foley Square than to Newark. However, these factors must be weighed in the setting created by Semmes' having initiated litigation in New Jersey and the likelihood that failure to stay the New York action will result in litigation in two courts [8]— a danger the judge recognized when he made his "denial of the stay subject to further developments in the two actions and further order of the Court." We thus see little force in his observation that the New Jersey action had been pending only a short time; the potential of future waste and conflict exists nonetheless unless Ford consents to dismissal. With respect to the elements favoring New York, the inconvenience to witnesses is exceedingly slight, as Judge Coolahan pointed out in denying a motion by the plaintiffs to transfer the New Jersey action to New York, and the Scarsdale and New York City witnesses are subject to subpoena for a trial in Newark, F.R.Civ.P. 45(e). Insofar as Semmes relies on the Federal Dealer Act, 15 U.S.C. § 1222, a New Jersey federal court is as well equipped to decide the issues as one in New York. See Clayton v. Warlick, 232 F.2d 699 (4 Cir. 1956). So far as the New York statute is concerned, see fn. 13, *infra*, it can scarcely be doubted that a dealer's purposeful submission of false warranty refund claims would constitute "cause" for termination to the extent that this is consistent with the governing contract. Interpretation of that may pose some problems, as we shall see, but the Ford Sales Agreement provides that it is "to be construed in accordance with the laws of Michigan"—a provision to which we assume both New York and New Jersey would give effect. A.L.I. Restatement of Conflict of Laws 2d § 332a, Tent.

8. Semmes has not sought an injunction against prosecution of the New Jersey action, and, for reasons outlined in the opinion, it would be an abuse of discretion to grant one.

Draft. No. 6 (1960). A New Jersey district judge can determine that as well— or badly—as one in New York. None of the factors relied on for giving priority to the second suit comes near the examples given in *Mattel, supra*, 353 F.2d at 424 n. 4. Although a district judge has considerable latitude in these matters, Kerotest Mfg. Co. v. C–O–Two Fire Equip. Co., 342 U.S. 180, 183–184, 72 S. Ct. 219, 96 L.Ed. 200 (1952), we hold that the court below went beyond the allowable bounds of discretion when it refused to grant Ford's motion for a stay and that a stay should be entered, provided that within fifteen days of the issuance of the mandate, Ford stipulates that Semmes, within twenty days thereafter, may file a reply and counterclaim (or, if Semmes prefers, an amended complaint) in the New Jersey action in respect to the termination of the dealership.[9]

Whether the temporary injunction entered by the district court should be set aside is quite another matter. The issues presented by Semmes' motion for a temporary injunction were difficult and complex, and a great deal of time and energy has been spent by Judge Ryan in deciding them and by us in reviewing his action. We see no reason for further expenditure of judicial time on this interlocutory issue when the important thing is to get on with the final hearing. The proper solution is rather to let the temporary injunction stand until the New Jersey action is decided on the merits. In so holding we assume that the New Jersey court will require Semmes to proceed speedily to trial; if that should not occur, the stay should not prevent Ford from asking that the temporary injunction be dissolved.[10]

This disposition will relieve Ford of its present dilemma of having either to

yield to Semmes' forum shopping or to litigate in two courts simultaneously, and the courts from the consequent unnecessary burdens. While it nevertheless allows Semmes to profit in some degree from its initiation of duplicative litigation and what we regard as an error of the court below, this consideration is outweighed by the other factors mentioned. In reaching this result we have been cognizant that in Kerotest Mfg. Co. v. C–O–Two Fire Equip. Co., *supra*, 342 U.S. at 183, 72 S.Ct. at 221, the call for "wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation" and the caution against "rigid mechanical solution of such problems" were directed to the courts of appeals as much as to the district courts.

What we have last said, of course, assumes that the district court's granting of the temporary injunction was otherwise proper. To that we now turn.

### III.

■ Our recital has already demonstrated that scant heed was paid to our observations in SEC v. Frank, 388 F.2d 486, 490–492 (2 Cir. 1968); see also SEC v. Great American Industries, Inc., 407 F.2d 453, 455 (2 Cir. 1968, in banc), cert. denied, 395 U.S. 920, 89 S.Ct. 1770, 23 L.Ed.2d 237 (1969), concerning the undesirability of issuing temporary injunctions solely on the basis of affidavits, particularly in "cases where everything turns on what happened and that is in sharp dispute." We recognize that this case differed from *Frank* in the greater urgency of Semmes' need, and we would have had no difficulty if the court had issued a temporary restraining order against termination; if Ford wished to present live testimony and

9. We are cognizant of the fact that the District Court for New Jersey has dismissed the complaint as to the Alliance. That order is reviewable by the Third Circuit—now if a certificate under F.R. Civ.P. 54(b) is obtained and in any event on appeal from the final judgment.

10. We assume also that Semmes will file its counterclaim if Ford stipulates it may do so, since otherwise a judgment in Ford's favor on the fraud counterclaim would be res judicata on the issue of termination.

this could not have been concluded within the twenty day period of F.R.Civ.P. 65(b), conditioning such presentation on an appropriate stipulation for extension of the restraining order would have solved the problem. However, so far as we can see, Ford joined the battle of affidavits with as much relish as the plaintiffs. A party who chooses to gamble on that procedure cannot be heard to complain of it when the decision is adverse.[11]

■ Consideration of the propriety of the temporary injunction must begin by recognizing that here, in Judge Frank's much quoted phrase, "the balance of hardships tips decidedly toward plaintiff," Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2 Cir. 1953). Ford's contention that Semmes failed to show irreparable injury from termination is wholly unpersuasive. Of course, Semmes' past profits would afford a basis for calculating damages for wrongful termination, and no one doubts Ford's ability to respond. But the right to continue a business in which William Semmes had engaged for twenty years and into which his son had recently entered is not measurable entirely in monetary terms; the Semmes want to sell automobiles, not to live on the income from a damages award. See Madsen v. Chrysler Corp., 261 F.Supp. 488, 507 (N.D.Ill.1966), vacated as moot, 375 F. 2d 773 (7 Cir. 1967). Moreover, they want to continue living. As Judge Goodrich said, a "judgment for damages acquired years after his franchise has been taken away and his business obliterated is small consolation to one who,

as here, has had a Ford franchise" for many years, Bateman v. Ford Motor Co., 302 F.2d 63, 66 (3 Cir. 1962). As against this, the hardship to Ford in continuing the Semmes dealership *pendente lite* was relatively small. Ford makes no claim that Semmes has not adequately represented it in the lucrative Scarsdale market, and the record indicates that the submission of false claims has been greatly reduced, if not eliminated. Ford urges it is irreparably injured "by forcing it to continue to be represented in an important vehicle market by a dealer which it has discovered to be unworthy of trust and by preventing it for years from making or implementing decisions affecting the Scarsdale area." But whether Semmes is in fact "unworthy of trust" is one of the very points at issue, and there need be no delay of "years" unless Ford wills it so. Ford points out also that the Automotive News has characterized the district court's decision as severely restricting "factory auditing procedures and the circumstances under which the factory may cancel due to warranty overclaims," and argues that this will make Ford an easy mark for fraudulent dealers throughout the land. We read the opinion as strictly limited to the facts of this case; any dealer who regards it as a Magna Carta for cheating Ford or any other manufacturer does so at his peril.

■ In light of the imbalance of hardship, affirmance of the temporary injunction does not depend on a holding that Semmes had demonstrated a likelihood of success;[12] it is necessary only that Semmes "has raised questions

---

11. We have taken note of Ford's request, under F.R.A.P. 10(c), that the record on appeal should reflect that at the argument on October 14, 1969, which was not transcribed, its counsel "twice offered to provide the Court with live testimony" and "the Court responded that live testimony would not be necessary." The court found in response that Ford "had opportunity before, at and after the oral argument of October 14, 1969, to offer and submit all papers and matters referred to it by its attorney on the oral argument held that day" and that "in that subse-

quent submission and in the later motion for reargument no request was made to the Court by any of the parties to hear oral testimony." Taking Ford's counsel at his word, we think his "offer" fell considerably short of an objection to the court's considering the motion on affidavits.

12. Contrast our recent decision in Arco Fuel Oil Co. v. Atlantic Richfield Co., 427 F.2d 517 (1970), where the balance lay heavily for the defendant.

going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation," Hamilton Watch Co. v. Benrus Watch Co., *supra*, 206 F.2d at 740. We think this test was met.

■ In seeking an injunction against termination, Semmes relied on the terms of the Sales Agreement, on § 197 of the New York General Business Law, McKinney's Consol.Laws, c. 20,[13] and on § 2 of the Federal Dealer Act, 15 U.S.C. § 1222.[14] It is common ground that the combined effect of the contract and of § 197 was that Ford could terminate Semmes' dealership only pursuant to paragraph 17(a) (2) (vii) of the Sales Agreement. This authorizes Ford to terminate because of "submission by the Dealer to the Company of false or fraudulent reports or statements, includ-

ing, without limitation, claims for labor or parts under paragraph 10 hereof [relating to Warranty] * * *." However, § 17(c) provides:

Opportunity to Cure Failure to Perform. Notwithstanding anything herein to the contrary, the Company shall give the Dealer a reasonable opportunity to cure any failure by the Dealer to fulfill or perform any duty, obligation or responsibility to be fulfilled or performed by the Dealer under or pursuant to paragraph 2, 5, 6, 10, 11, 12, 13, 14 or 15 prior to giving the Dealer notice of termination based upon such failure.

■ Ford argues that § 17(c) is inapplicable, on several grounds. It asserts that when § 17(c) refers to the obligations to be performed by the Dealer under paragraph 10, it is speaking of just exactly that,[15] the applicable termi-

---

13. This provides:

> § 197. Contracts for sales of motor vehicles.
>
> No manufacturer or distributor, or any agent of such manufacturer or distributor, shall terminate any contract, agreement, or understanding or renewal thereof for the sale of new motor vehicles to a distributor or dealer, as the case may be, except for cause.

14. This provides:

> § 1222. Authorization of suits against manufacturers; amount of recovery; defenses
>
> An automobile dealer may bring suit against any automobile manufacturer engaged in commerce, in any district court of the United States in the district in which said manufacturer resides, or is found, or has an agent, without respect to the amount in controversy, and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer from and after August 8, 1956 to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling or not renewing the franchise with said dealer: *Provided*, That in any such suit the manufacturer shall not be barred from asserting in defense of any such action the failure of the dealer to act in good faith.

> Section 1221(e) defines "good faith" to mean "the duty of each party to any

franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided*, That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith." Although we are not required to reach the applicability of the Dealer Act, we are singularly unimpressed by Ford's contention that the reference to damages in § 1222 was meant to preclude an injunction. See Bateman v. Ford Motor Co., *supra*, 302 F.2d 63, 66; Madsen v. Chrysler Corp., *supra*, 261 F.Supp. 488, 506–507; Swartz v. Chrysler Motors Corp., 297 F.Supp. 834 (D.N. J.1969); Dahlberg Bros., Inc. v. Ford Motor Co., 272 Minn. 264, 137 N.W.2d 314 (Minn.1965). Cf. Walling v. Brooklyn Braid Co., 152 F.2d 938 (2 Cir. 1945).

15. Much of paragraph 10 concerns obligations of the Company to the Dealer, including the reimbursement of Dealer Warranty Claims. The obligations of the Dealer under that paragraph are to notify the Company of any defective part within 20 days after the Dealer obtains knowledge of it; to extend a warranty substantially similar to that made to it by the Company in connection with each retail sale of a vehicle, each sale of a

nation clause for which is § 17(a) (1), not of the Dealer's obligation to refrain from submitting false refund claims, termination for which is governed solely by § 17(a) (2) (vii). That could well be so, but Ford encounters the rule of "construction against the draftsman," which applies with particular force "in cases of standardized contracts and in cases where the drafting party has the stronger bargaining position." ALI, Restatement of Contracts 2d, Tent. Draft No. 5, § 232 at pp. 103–04 (1970). See also 9 Williston, Contracts, § 1017A at pp. 162–65 (3d ed. 1967). Also the meaning urged by Ford is not so crystal-clear as to prevail over contrary evidence from a past course of dealing that may be adduced, Restatement of Contracts 2d, *supra*, §§ 228(4) and 249. Ford argues further that when fraud has been deliberate and massive, as it contends Semmes' to have been, a dealer cannot "cure" this any more than a trustee can "cure" embezzlement so as to stave off removal or a spouse can "cure" adultery so as to prevent divorce.[16] That likewise may well be true, at least in the absence of condonation. But Semmes disputes the fraud and claims that Ford's long inaction with knowledge of the facts and its promise to give it an opportunity to check the audit require at least a postponement of rights that Ford might otherwise have. This also is a sufficient answer, for the present limited purpose, to Ford's claim that if opportunity to cure is required, that has already been afforded. We thus do not need to consider whether, if all else should be decided in Ford's favor, Semmes might still prevail, either under general principles of contract law, see Restatement of Contracts 2d, *supra*, § 231(d), or under the Dealer Act, on the ground that a termination permitted by the terms of the contract was impermissibly motivated.

If the judge was thus justified in issuing the temporary injunction on the papers before him on December 5, he was not required to alter his decision because of the further showing on the motion to vacate. We have quite recently disapproved the practice of "trying to relitigate on a fuller record preliminary injunction issues already decided." American Optical Co. v. Rayex Corp., 394 F.2d 155, cert. denied, 393 U.S. 835, 89 S.Ct. 109, 21 L.Ed.2d 106 (1968). In any event, the only truly new evidence was Charney's affidavit, and the judge was amply justified in finding that Ford had failed to exercise due diligence in not presenting this earlier. Moreover, this was the sort of evidence that cried for oral examination, and although Ford offered to produce witnesses to show that Neuhart's report was "not a recent fabrication," it made no offer to produce Charney.

As indicated, our affirmance of the temporary injunction against termination assumes that Ford will be accorded an early trial if it so requests.

### IV.

Ford appeals also from the following provision of the injunction order:

1. The motion of the plaintiff, Semmes Motors, Inc., to enjoin the defendant from contacting directly or indirectly the customers of the plaintiff, Semmes Motors, Inc., pending the final hearing and determination of this action (a) is granted to the following extent:

(i) The defendant's interviews of customers are limited to matters of repairs questioned on its audit only, and are not to go into other matters, said interviews to be bona fide and accompanied by the simultaneous visual inspection of the car so that no grounds of harassment

---

company product to another dealer, and each sale of a part, accessory or equipment for a company product; and to fulfill the terms of each such warranty.

16. Compare the provision in § 17(a) (2) (vi) authorizing termination for a conviction of the dealer for any violation of law tending in Ford's opinion to affect him or it adversely.

may be levelled at the defendant; and

(ii) The plaintiff may contact these same customers and inspect their cars without interference from the defendant, and (b) is denied in all other respects except that said denial is without prejudice to the said plaintiffs seeking further relief in the event that it can demonstrate that defendant's activities and communications with its customers are exceeding or have exceeded the bounds of litigation preparation and investigation.

While plaintiffs are doubtless right in asserting that this portion of the order would not be appealable if it stood alone, International Prods. Corp. v. Koons, 325 F.2d 403, 406–407 (2 Cir. 1963), the reasons outlined in section II of this opinion to sustain our power to review the order refusing to stay the New York action are equally applicable here.

The only complaint with respect to this provision that we regard as serious concerns the limitation of interviews "to matters of repairs *questioned on its audit only*." (Italics supplied.) Ford reads the italicized words, as we would, as confining customer contacts to owners of those vehicles that were a subject of the August 4–28, 1969, audit. Against this, plaintiff points to remarks by the judge at the argument of the motion to vacate to the effect that he had not stayed Ford's counsel "from conducting a pre-trial investigation such as an attorney might well do" and that Ford was not precluded from talking to owners of 191 vehicles that had been examined although not covered by the audit. At the same time plaintiffs apparently wish to preserve whatever benefits this portion of the order gave them.

While Ford's counsel might have been able to clear up the matter with greater persistence, we think the order should be modified to make clear that Ford is not to be limited to those customers whose cars were a subject of the August, 1969, audit. Ford's contention of large-scale submission of false and fraudulent Warranty Refund Claims by Semmes is serious and substantially supported. Insofar as these claims concern repairs allegedly not performed at all, Semmes' records will be of no assistance in developing the facts; the claim is that the records are false and only inspection of the cars or interviewing the owners can establish this. Moreover, one of Semmes' contentions is that the claims chosen for audit were a biased sample; Ford is entitled to counter this by going beyond these. Semmes is sufficiently protected by the substantive limitations on the nature of the interviews which the judge imposed. Volkswagenwerk Aktiengesellschaft v. Westburg, 260 F.Supp. 636 (E.D. Pa. 1966), cited by Semmes, may be distinguishable on the basis of Volkswagen's lack of need for calling customers in the different circumstances there presented; if it is not, we would not agree with it. Buono Sales, Inc. v. Chrysler Motors Corp., 363 F.2d 43, 49 (3 Cir., in banc), cert. denied, 385 U.S. 971, 87 S.Ct. 510, 17 L.Ed.2d 435 (1966), also cited, does not speak at all to the point here at issue.

The phrase quoted from paragraph 1 of the injunction is therefore modified to read "to matters of repair questioned by defendant." As so modified, the injunction is affirmed and shall remain in effect until termination of the New Jersey action, subject to Ford's right to apply for a dissolution if the action is not moved speedily to trial. Upon the filing of a stipulation by Ford as outlined in section II of this opinion, all other proceedings in this action shall be stayed pending termination of the New Jersey action. The appeal from the order refusing to vacate the injunction is dismissed. No costs.