317 So.2d 795 (1975)
BURGER CHEF SYSTEMS, INC., Appellant,
v.
BURGER CHEF OF FLORIDA, INC., and Wesley S. Woodson, Appellees.
No. 74-1194.
District Court of Appeal of Florida, Fourth District.
July 18, 1975.
Rehearings Denied September 29, 1975.
*796 William E. Sadowski and John H. Ward, Helliwell, Melrose & DeWolf, Miami, for appellant.
William L. Eagan, Arnold, Matheny & Eagan, Orlando, for appellees.
WALDEN, Chief Judge.
This is an appeal by Burger Chef Systems (Franchisor) from an injunction preventing it from terminating its July 14th, 1966, franchise agreement with Burger Chef of Florida, Inc. (Franchisee). The injunction was entered upon a request by Franchisor for a declaratory judgment defining its right to terminate under the agreement. The trial court found the territorial franchise was terminable only for cause, and not terminable at the will of Franchisor without cause. We agree with the trial court's interpretation of the applicable franchise agreement clause, which reads as follows:
"ITEM VII
"In the event that Licensee or William P. Woodson, individually or collectively, own less than one hundred percent (100%) of the voting outstanding stock of an assignee corporation, or in the event of the death of both Licensee and William P. Woodson and the assignee corporation does not fulfill the Licensee's obligations under this agreement, which alleged failure to fulfill the obligations under this agreement shall be determined by Burger Chef, then this Territory Franchise Agreement shall be terminated. Burger Chef shall then take over the obligations of this agreement and Burger Chef will pay to Licensee, his heirs, executors, or assigns, or to assignees an amount equal to twenty-five percent (25%) of the service charges collected from each store sold and installed by Licensee, said payments to continue for a period ending ten (10) years from date of termination; provided, however, that nothing contained herein shall require Burger Chef to continue the operation of stores sold and installed by Licensee if it should become impracticable to continue such operation. The payment of said twenty-five percent (25%) of the service charges collected shall be made only after such service charges have been received by Burger Chef from the store franchise owner."
The trial court continued, however, to grant an injunction against any action in termination by Franchisor:
"The ... [Franchisor] is hereby permanently enjoined and restrained from the cancellation or termination of the territorial franchise agreement issued by ... [Franchisor] to ... [Franchisee], WESLEY S. WOODSON, dated July 14, 1966, and assigned to ... [Franchisee], BURGER CHEF OF FLORIDA, INC., except in the manner provided in the instrument in case of default by ... [Franchisees]. The suspension of the operation and effect of the ... [Franchisor's] termination letter of May 21, 1973, as provided in the Court's temporary order of February 4, 1974, is confirmed and made permanent and the . .. [Franchisor], its agents, servants and employees are restrained from refusing to furnish customary accountings and reports, payments and remittances in accordance with the previous normal practice of the parties under the franchise agreement so long as it remains in effect."
We reverse this action of the trial court. The injunction, requiring as it does the continued performance of Franchisor, is essentially a grant of specific performance to Franchisee. 29A Fla.Jur., Specific Performance § 4 (1967):
"It is pertinently observed that certain other forms of action constitute, in effect, actions for the specific performance of contractual obligations. For example, injunction against breach of contracts, *797 or the enforcement of negative covenants in contracts by injunction against their breach, may result in specific performance of the contract, ..." Id. at 576.
We are aware of the individual characteristics of a franchise; the personal efforts and commitment on the part of a Franchisee to market the Franchisor's products, the consideration given by Franchisee for the exclusive right to market Franchisor's product and the singular personal service performed by a Franchisee in establishing the product of a Franchisor. Nonetheless, the rules of specific performance must govern, and it is improper to  in effect  grant this Franchisee a decree of specific performance. Mutuality of obligation and remedy must exist for a specific performance suit to succeed. Florida-Georgia Chemical Co., Inc. v. National Laboratories, Inc., 153 So.2d 752 (1st DCA Fla. 1963); Con-Dev of Vero Beach, Inc. v. Casano, 272 So.2d 203 (4th DCA Fla. 1973); see Sanchez v. Crandon Wholesale Drug Co., 173 So.2d 687 (Fla. 1965). 29A Fla.Jur., Specific Performance § 33 (1967):
"Insofar as mutuality of remedies is concerned, it is clear that there must exist a recognized mutuality of remedies in equity between the parties to the suit which can constitute a basis for awarding specific performance in equity to the complanant, as against the defendant." Id. at 621.
Franchisee here is bound by the agreement to perform certain personal services to Franchisor.[1] Personal services are not subject to a suit for specific performance.[2]Florida-Georgia Chemical Co., Inc. v. National Laboratories, Inc., supra; 29A Fla. Jur., Specific Performance § 111 (1967); see Sanchez v. Crandon Wholesale Drug *798 Co., supra. As a result, the order granting, as it does, specific performance to Franchisee, is in error  as no like order could be had for Franchisor.
Franchisee must seek his damages at law should Franchisor breach. We find that remedy of damages is adequate to compensate Franchisee, should Franchisor breach. The measure of damages would depend upon a jury evaluation of what would be a reasonable time for the contract duration. See Annot., 19 ALR3d 196, Termination by Principal of Distributorship Contract Containing No Express Provision for Termination (1968). In 62 Am.Jur.2d 769 § 12, Termination of Franchise (1972) it is noted:
"It is usually true that the actual understanding and expectation is that the franchisee will make a substantial commitment in time or money to develop and establish the business of selling the product of service of which the franchisor will also be a beneficiary, and it would therefore be unfair for the franchisor to wait until this is done and then arbitrarily terminate the contract without cause, and thus compel the franchisee to lose his investment in time and money.

"Generally, the franchise contract is for a specific term of years, and the agreement usually provides for renewals. A franchise agreement by means of which a franchisee is given the right to operate his franchise for a definite term of years cannot be said to be terminable at the mere option of the franchisor." (Emphasis added.) Id. at 770.
This contract spoke of no time duration, although it did provide that should Franchisee breach, and Franchisor, therefore, terminate for cause, Franchisee for ten years thereafter should receive 25% of all service fees generated from operative stores in his former franchise area.[3] It follows that Franchisee's damages for Franchisor's breach could be no less than this amount, plus any damages in lost income determined by a jury to be due and owing the Franchisee. For a discussion of analogous termination problems see annot. 19 ALR3d 196, supra, in which it is said:
"What constitutes a `Reasonable Time' for the duration of a distributorship or sales agency has been deemed to be a question of fact, or a mixed question of law and fact, which depends upon the general nature and circumstances of the case."
Reversed and remanded for action not inconsistent with the foregoing opinion.
Reversed and remanded.
OWEN and CROSS, JJ., concur.
NOTES
[1] III
"(1) Licensee agrees to franchise, sell and install Burger Chef stores and sell the complete line of Burger Chef equipment necessary for the sale of Burger Chef products only upon the form of agreement furnished by Burger Chef. The form of agreement shall be `Burger Chef Franchise and Lease Agreement' and `Burger Chef Franchise Agreement', a current copy of which is attached hereto for purposes of illustration only and which may be amended from time to time, and which is marked `Exhibit A'. Neither the said Burger Chef Franchise and Lease Agreement nor the Burger Chef Franchise Agreement shall be effective until approved and executed by an authorized representative of Burger Chef at Indianapolis, Indiana, and shall not be signed by Licensee as agent of Burger Chef.
"(2) Licensee or his agent (said agent to be approved by Burger Chef) agrees to make a minimum of two (2) calls per month at each Burger Chef store in the territories hereinbefore described in ITEM I to render aid and assistance to the store franchise owner, and Licensee further agrees to prepare and submit to Burger Chef office at 1348 West 16th Street, Indianapolis, Indiana 46207, a written store inspection report on forms provided by Burger Chef for each store at the time of making his two monthly calls. The above requirement may be modified or waived by Burger Chef by written agreement.
"(3) Licensee agrees to travel to Indianapolis or other designated place for the purpose of receiving training in Burger Chef procedures, practices and methods.
"(4) Licensee agrees to complete and forward to Burger Chef, Indianapolis, Indiana, all forms and papers as may be required from time to time by Burger Chef pertaining to the leasing, sales, inspection and operation of the stores in the territories described in ITEM I.
"(5) Licensee agrees that in the event Burger Chef is required by the terms of the lease to open a store before a qualified operator is obtained, the Licensee will assume all obligations contingent with the opening and operation of said store including any rent that might become due until a qualified operator is secured. Furthermore, any net profit which shall accrue during this period when the store is held by the Licensee shall accrue to the Licensee as compensation for said operation. At the time the store is sold to an operator all liabilities shall be transferred to said operator."
[2] There are cases in which temporary injunctions have been granted against termination while suits were in progress. Bateman v. Ford Motor Co., 302 F.2d 63 (3d Cir.1962); Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197 (2d Cir.1970).
[3] V
"In the event of any default of Licensee of any of the provisions of this agreement, Burger Chef shall, after the giving of thirty (30) days notice in writing by registered mail, and if remaining uncorrected after thirty (30) days, have the right to terminate Licensee's right in this Territory Franchise Agreement. In the event of such termination by Burger Chef, Licensee shall be paid an amount equal to twenty-five percent (25%) of the service charges collected from each store sold and installed by Licensee for a period ending ten (10) years from the date of termination of this agreement; provided, however, that nothing contained herein shall require Burger Chef to continue the operation of stores sold and installed by Licensee if it should become impracticable to continue such operation. The payment of said twenty-five percent (25%) of the service charges collected shall be made only after such service charges have been received by Burger Chef from the store franchise owner."