AUGUSTA NEWS COMPANY d/b/a
Kennebec News Co., Inc., Plaintiff,

v.

NEWS AMERICA PUBLISHING,
INCORPORATED, et al.,
Defendants.

Civ. No. 89–0289–P.

United States District Court,
D. Maine.

Oct. 26, 1990.

Ernest J. Babcock, Harold J. Friedman, Friedman & Babcock, Portland, Me., for Winebaum News.

Samuel E. Klein, Martin J. D'Urso, Kohn, Savett, Klein & Graf, Philadelphia, Pa., for News Am.

George Singal, Gross, Minsky, Mogul & Singal, Bangor, Me., for Magazines Inc.

Jonathan S. Piper, Preti Flaherty Beliveau & Pachios, Portland, Me., for New Am and Elm.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, Chief Judge.

This case returns to the Court on Plaintiff Augusta News Company's Motion for Preliminary Injunction. For the reasons discussed below, the Motion is denied.

### I. BACKGROUND

Augusta News Company (d/b/a Kennebec News Company, hereinafter Plaintiff) is a Maine corporation engaged in the wholesale distribution of periodicals in

Maine. News America Publishing Incorporated (hereinafter News America) is a Delaware corporation which publishes and distributes periodicals nationally to local independent distributors, including Plaintiff.[1] News America distributes both its own periodicals and those of other publishers. Most important in this case, News America publishes and distributes *TV Guide,* which is alleged to be the best selling magazine in the United States considering the aggregate sales of its 150 regional editions. The other Defendants in this action are Joseph Elm, Vice President/Single Copy Sales for News America; Winebaum News, Inc. (hereinafter Winebaum News), another local independent distributor of periodicals; and Magazines, Inc., also a local independent distributor of periodicals.

The parties describe the following distribution system for single copy sales of periodicals. National distributors purchase periodicals from publishers and distribute these periodicals to local independent distributors. The independent distributors then wholesale the periodicals to retail outlets (e.g., drug stores, supermarkets, newsstands etc.) which, in turn, sell the periodicals to the public. The independent distributor ordinarily guarantees that any unsold periodicals will be credited to the retail outlet's account. The national distributor, in turn, gives a credit to the local independent distributor based on the number of returned periodicals. The national distributor then adjusts the quantity of periodicals it supplies to the independent distributor based on the number of returns received and related marketing data.

News America collects client lists, called "dealer guides," from the independent distributors with which it does business. The dealer guides are provided by the independent distributors so that News America may monitor the sales and marketing of its periodicals. News America and at least one independent distributor aver that the dealer guides are confidential information provided by the independent distributors with the understanding that the guides would not be given to any third parties. *See* Memorandum of Law and Supporting Materials of News America Publishing, Inc. in Opposition to Plaintiff's Request for Injunctive Relief, Exhibit A at 5–8 (Docket No. 3M) (hereinafter News America Memorandum); Affidavit of Sidney Stern at ¶¶ 4–6 (Docket No. 17); Affidavit of Joseph Elm at ¶¶ 4–5 (Docket No. 18) (hereinafter Elm Affidavit).

Plaintiff avers that fifty percent of its total purchases from national distributors consists of magazines and tabloids controlled or influenced by News America.[2] Many of these periodicals are sold in the increasingly lucrative supermarket and chain store market, typically in racks near checkout counters. The events leading to this cause of action arose when Hannaford Bros. Co. (hereinafter Hannaford), owner of Shop 'N Save supermarkets and Wellby drug stores in Maine and New Hampshire, distributed a memorandum in early 1989 to independent distributors in the area. The memorandum questioned the propriety of a geographic division of territories among independent distributors,[3] and announced that Hannaford would accept bids from all independent distributors seeking to supply its stores with periodicals regardless of traditional geographic boundaries.

Prior to the Hannaford memorandum, Plaintiff's business with Hannaford stores in the Augusta–Waterville–Skowhegan region of Maine had accounted for forty per-

---

**1.** News America apparently has several subsidiaries and divisions including Murdoch Magazines Distribution Division and News America Publications Inc. The Court cannot detect any significant reason for distinguishing between these related entities. "News America" should be read in this opinion to include all of these organizations.

**2.** Plaintiff offers the following list as typical of the periodicals it purchases from News America: *TV Guide, Star, Soap Opera Digest, News-*

week, Woman's World, New Woman, Premiere, Weekly World News, Enquirer, Soap Opera Weekly, Readers Digest, Seventeen, First for Woman, Mirabella, Automobile. Affidavit of Howard G. Kunitz at ¶ 5 (Docket No. 11) (hereinafter Kunitz Affidavit).

**3.** There is dispute among the parties whether such a territorial division actually exists. The Court cannot and need not decide this issue at this point in the litigation.

cent of Plaintiff's total sales. Kunitz Affidavit at ¶ 10 (Docket No. 11). At approximately the same time Hannaford distributed its memorandum, Defendant Magazines, Inc. announced its intention to supply periodicals to five Mr. Paperback stores in Plaintiff's traditional territory.[4] Plaintiff's survival was therefore put in serious doubt by both the looming threat of the loss of Hannaford's business and a significant incursion into its remaining reservoir of customers. In an effort to mitigate the potentially fatal effects of a possible loss of important customers, Plaintiff sought to solicit business outside its traditional sales area.

Plaintiff's solicitation campaign required a commitment from News America that it would supply Plaintiff with the necessary periodicals for any new customers. Most important, Plaintiff would have needed copies of the regional *TV Guide* for New Hampshire as well as additional copies of *TV Guide* for Maine had Plaintiff won the Hannaford bidding contest or secured new customers. The parties disagree whether News America ever agreed to supply New Hampshire's *TV Guide* and the necessary additional periodicals. In fact, the additional periodicals and the New Hampshire edition of *TV Guide* were not provided.

Plaintiff's Complaint, filed with this Court on December 4, 1989, charges that Defendants News America and Elm acted in concert with Defendants Winebaum News and Magazines, Inc. to block Plaintiff from expanding its sales area beyond its traditional boundaries. Specifically, Plaintiff alleges that Defendants conspired to withhold the New Hampshire edition of *TV Guide* and additional supplies of the other periodicals distributed by News America, thereby effectively halting Plaintiff's solicitation and expansion. The Complaint claims that these alleged activities constitute a combination and conspiracy which unreasonably restrained trade, monopolized, and refused to deal in an attempt to monopolize, in violation of sections four and sixteen of the Clayton Act, 15 U.S.C. §§ 15, 26; sections one and two of the Sherman Act, 15 U.S.C. §§ 1, 2; Maine's antitrust laws, 10 M.R.S.A. §§ 1101, 1102; and New Hampshire's antitrust laws, N.H.Rev.Stat.Ann. § 356:3.[5]

Plaintiff is certainly not a wide-eyed bystander in the events which led up to this litigation. The first target for Plaintiff's solicitations was territory in New Hampshire traditionally serviced by Defendant Winebaum News. Plaintiff's owner and president, Howard Kunitz, approached Martin Driscoll, a district sales manager for News America, in an effort to secure a copy of Winebaum News's dealer guide.[6] There is no dispute that Driscoll gave Kunitz a one-year-old copy of the confidential dealer guide, and received ten one-hundred dollar bills in return. Kunitz admits that he sought, received and used the dealer guide in his solicitations for Plaintiff, although he asserts that the dealer guide was neither confidential nor useful. Defendant News America apparently became aware of Driscoll's "sale" of Winebaum News's dealer guide to Plaintiff only when Kunitz was deposed for this litigation on July 24, 1990. Elm Affidavit at ¶ 6 (Docket No. 18). Driscoll was fired from his position with News America on July 26, 1990

---

**4.** There is a dispute in the record, not relevant to the present Motion, whether Defendant Magazines, Inc. controlled these Mr. Paperback stores.

**5.** Plaintiff also claimed breach of contract, breach of duty of good faith and fair dealing, tortious interference with an advantageous relationship, and unfair competition against certain of the Defendants. Defendant Winebaum News has counter-claimed alleging unfair competition and defamation by Plaintiff.

**6.** Driscoll recounted the conversation with Kunitz in a deposition as follows:

He asked me if I had dealer guides, if I had a dealer guide for Winebaum News, and I said yes, I did. He asked me if he could get it and he would make it worth my while. I told him that I had two of them, a new one and an old one, and that I wouldn't part with the new one. He said he would make it well worth my while if I brought the old one with me the next time I came up in his area.

News America Memorandum, Exhibit A at 9 (Docket No. 3M). *See also* Affidavit of Martin C. Driscoll, Jr. at ¶ 12 (Docket No. 12).

and hired on July 30, 1990 as a consultant by Plaintiff.

On August 7, 1990, Defendant News America's counsel wrote to Plaintiff's counsel notifying him that News America was seriously considering discontinuing its business relationship with Plaintiff as a consequence of the Kunitz–Driscoll deal for Winebaum News's dealer guide. News America's action was purportedly taken at the insistence of various wholesalers with whom Defendant Elm met on August 2, 1990. On August 21, 1990, Plaintiff filed this Motion for a Preliminary Injunction seeking an order enjoining Defendant News America from refusing to continue to do business with Plaintiff until the issues in this action have been addressed on the merits.[7]

Plaintiff claims that a discontinuation of service by Defendant News America would cost Plaintiff fifty percent of its total sales and thereby force Plaintiff out of business. Defendant News America argues that it should not be required to continue doing business with a customer which "bribed" a News America employee to provide confidential information. News America suggests that a mandated relationship with Plaintiff would endanger News America's relationships with other independent distributors.

## II. PRELIMINARY INJUNCTION

■ Pursuant to well-established precedent in this circuit, the availability of a preliminary injunction requires findings by the Court

(1) that the plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which the granting of injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction.

*Stanton by Stanton v. Brunswick School Department,* 577 F.Supp. 1560, 1567 (D.Me.1984). *See also Planned Parenthood League v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981). Preliminary injunctions must be used sparingly and only in cases where the need for extraordinary equitable relief is clear and plain. *Saco Defense System Division, Maremont Corp. v. Weinberger,* 606 F.Supp. 446, 450 (D.Me. 1985) (citation omitted).

■ Plaintiff suggests that the compelling nature of the impending harm it faces—the alleged destruction of its business—requires this Court to grant a preliminary injunction even if Plaintiff should fail to demonstrate a likelihood of success on the merits. The Court is not persuaded, that Plaintiff has satisfied its burden of establishing that it will suffer the destruction of its business. Therefore, the Court need not address the likelihood that Plaintiff will succeed on the merits. A preliminary injunction is not an appropriate remedy in the absence of irreparable harm to the Plaintiff.

### A.

■ *Semmes Motors, Inc. v. Ford Motor Company,* 429 F.2d 1197 (2d Cir.1970), is

---

**7.** This Court initially granted the Motion for Preliminary Injunction after Defendant News America failed to respond, even after an extension had been granted. *See* Order Granting Motion for Preliminary Injunction (Docket No. 12). Pursuant to Local Rule 19(c), motions which are not opposed are deemed consented to by the nonmoving party.

Defendant News America, aware that it had violated an important rule which this Court enforces without hesitation against thoughtless, inattentive, and careless counsel, moved this Court for relief from the order. The Court granted Defendant's unopposed Motion for Relief, but with this stern warning:

Suffice it to say that counsel should clearly understand for the future that the Court nei-

ther relishes, appreciates, nor condones this discourteous inattention to the demands upon the Court's time.... The Bar generally, and specifically counsel in this defense counsel's office, will be well advised to have clearly in mind in the future that the Court will, without compunction or regret, leave counsel who attempt unilaterally to enlarge the procedural time periods prescribed in this Court behoist upon their own petard in any recurring situation of a similar nature.

Memorandum of Decision on Motion for Relief from Order Granting Preliminary Injunction by Defendant News America Publishing, Inc. (Docket No. 15).

the case most often cited for the proposition that the destruction of a business is an irreparable injury which can be appropriately remedied with injunctive relief. *Id.* at 1205. *Accord Engine Specialties, Inc. v. Bombardier Limited,* 454 F.2d 527, 531 (1st Cir.1972).[8] But the evidence on this record, other than the bare conclusory assertions of Plaintiff's president, does not support the contention that Plaintiff will be forced out of business. A preliminary injunction is not an appropriate remedy in circumstances where the plaintiff will experience only a partial loss of business short of complete destruction. *See C–B Kenworth, Inc. v. General Motors Corp.,* 675 F.Supp. 686, 688 n. 4 (D.Me.1987); *Envirogas, Inc. v. Walker Energy Partners,* 641 F.Supp. 1339, 1343 (W.D.N.Y.1986). *See also Los Angeles Memorial Coliseum Commission v. National Football League,* 634 F.2d 1197, 1202–03 (9th Cir.1980).

■ Plaintiff specifically avers that the termination of its relationship with News America will cause Plaintiff to lose Hannaford's Shop 'N Save supermarkets and two Shaw's supermarkets as customers. These chain stores account for approximately fifty percent of Plaintiff's business, with Hannaford representing forty percent and Shaw's an additional ten percent. *See* Kunitz Affidavit at ¶¶ 8, 10–12 (Docket No. 11). The record establishes, however, that Plaintiff could not be assured that Hanna-

ford would remain its customer regardless of the course of Plaintiff's relationship with Defendant News America. Before this litigation commenced, Hannaford sought bids from other suppliers which might have supplanted Plaintiff as Hannaford's periodical supplier. The record does not support an inference that Plaintiff would have won Hannaford's bidding contest. Thus, Defendant News America cannot be reasonably charged with the responsibility for the loss of Plaintiff's business with Hannaford. In sum, the suggestion that Plaintiff will be destroyed is entirely too speculative on this record to support the granting of a preliminary injunction.

Not all injuries to businesses can be appropriately remedied using a preliminary injunction. As one circuit court stated, "true injury of the *Semmes* type is improper deprivation of an inveterate enterprise that, but for the defendant's challenged action, could be expected to continue." *ABA Distributors, Inc. v. Adolph Coors Co.,* 661 F.2d 712, 714 (8th Cir.1981). Plaintiff's allegations on this record have shown only a potential ten percent loss of business—the loss of Plaintiff's business with Shaw's supermarkets—may be attributable to Defendant News America's threatened termination of service to Plaintiff.[9] Loss of business can be readily compensated for by a damages remedy. A preliminary injunction is, therefore, neither necessary nor prudent. *C–B Kenworth,*

---

**8.** There is an important distinction between appellate review of a preliminary injunction and a trial court's granting of a preliminary injunction. At the trial court level, the court must find that plaintiff has satisfied the burden of establishing the existence of the four requisites for a preliminary injunction. At the appellate level, *the opponent of a preliminary injunction* which is already in place "has the heavy burden of showing a clear error of law or an abuse of discretion." *Engine Specialties,* 454 F.2d at 530.

The *Engine Specialties* and *Semmes Motors* holdings must therefore be read in the context of this strict appellate review standard. In those cases, the appellants failed to establish that there were abuses of discretion or clear errors of law in the trial courts' findings that the destruction of the appellees' businesses constituted irreparable harm. The standard in this proceeding requires Plaintiff to establish that its business will be destroyed without the protection of a preliminary injunction.

**9.** The Court makes this finding based on Plaintiff's specific averments of evidentiary quality on the record herein. Because there are no other such averments of injury to Plaintiff's business, the Court assumes that no additional injury relevant to this Motion will be suffered.

At a conference held with all counsel this date at which the pending motion was discussed, Plaintiff's counsel, in oral argument, made assertions that Plaintiff stands in jeopardy of being unable to regain its sales territory if Defendant News America should cut off its supply of magazines. Those assertions are not supported on the record here and Plaintiff has sought no hearing as an opportunity to support them. Even if supported by evidence, however, such assertions would be no basis for a finding of irreparable harm in view of the fact, as pointed out in the text, that Plaintiff has no proven contract right to the distributorship or to any vested right to any specific territory, in any event.

*Inc.*, 675 F.Supp. at 687. *See also Auburn News Co., Inc. v. Providence Journal Co.*, 659 F.2d 273, 277 (1st Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982).

In *Stendig International, Inc. v. B & B Italia, S.p.A.*, 633 F.Supp. 27 (S.D. N.Y.1986), the court held that the loss of thirty percent of the plaintiff's business was not sufficient to constitute irreparable injury. *Id.* at 28 n. 3. This Court is satisfied that a ten percent loss of business cannot constitute irreparable injury justifying the radical remedy of a preliminary injunction. Even a fifty percent loss of business, the maximum loss which can be supported on this record, is insufficient to support the granting of a preliminary injunction in the absence of a clear showing by Plaintiff that it will thereby be destroyed.

### B.

Unlike the relationships between the parties in *Engine Specialties* and *Semmes Motors*, there is nothing in this record which establishes the specific terms of a valid contract between Plaintiff and News America. Neither party has alleged the existence of any agreement, whether oral or written, governing the distributor-distributee relationship. In the absence of an express agreement or a statutory mandate to the contrary, the Court is satisfied on this record that Plaintiff and News America have an "at-will" relationship freely terminable by either party. Plaintiff's Motion for Preliminary Injunction, therefore, asks this Court to create and enforce a relationship to which Plaintiff would not be entitled outside of this litigation.

In *Engine Specialties*, the plaintiff had contracted with Agrati–Garelli, S.p.A., for the manufacture and sale of mini-cycles under plaintiff's trade name. 454 F.2d at 528. Prior to delivery of the mini-cycles, Bombardier, Ltd. met with Agrati–Garelli in an effort to avoid Agrati–Garelli exclusive contract with Engine Specialties (hereinafter ESI). The result of those meetings was the disavowal by Agrati–Garelli of its contract with ESI and the sale of the mini-

cycles to Bombardier, Ltd. *Id.* at 529. The Court of Appeals for the First Circuit upheld a preliminary injunction restraining Bombardier, Ltd. from marketing and selling the mini-cycles in North America after finding that Bombardier's tortious interference with the Agrati–ESI contract "turned ESI from a profitable business into an unprofitable one." *Id.* at 531.

In *Semmes Motors*, the plaintiff, a Ford automobile franchisee, had been accused of submitting fraudulent refund claims for repairs warrantied by Ford Motor Company. 429 F.2d at 1199–1200. The plaintiff sought a preliminary injunction to restrain Ford from terminating its dealership while the fraud claim was being litigated. *Id.* at 1200. The Court of Appeals for the Second Circuit upheld the issuance of a preliminary injunction after carefully scrutinizing the sales agreement between Ford and Semmes Motors. The court held that the contract did not permit termination of the franchise agreement under the factual circumstances alleged by Ford. *Id.* at 1206–07. In sum, both the *Engine Specialties* court and the *Semmes Motors* court were enforcing contracts of continuing validity when they enjoined the respective defendants from withdrawing from their business relationships with the plaintiffs.

The rationale underlying these cases is not difficult to glean. Contracts create reasonable expectations of performance or of a remedy for nonperformance. *See, e.g.,* Restatement (Second) of Contracts § 1 (1981). Accordingly, businesses which predicate their continued existence on a contractual relationship with another entity or person have a reasonable expectation that the law will enforce the contract and thereby prevent the destruction of that business. The *Semmes Motors* and *Engine Specialties* courts both fulfilled these expectations for their respective plaintiffs by enforcing existing valid contracts. In the present case, neither Plaintiff nor Defendant News America has alleged the existence of an ongoing contractual or franchise relationship between the parties.[10]

---

**10.** The Complaint includes a breach of contract claim, but the Court understands that claim to

On this record, Plaintiff cannot reasonably expect that the law would guarantee the continued existence of its relationship with Defendant News America simply because the consequence of discontinuing that relationship would be the loss of its business. There must be some legal basis, such as a contract or an enforceable promise, for restraining Defendant News America from discontinuing its relationship with Plaintiff.

Plaintiff has not established that any such legal basis exists. *See Stendig International,* 633 F.Supp. at 28 n. 3. Accordingly, this Court finds that the injury Plaintiff alleges will occur if Defendant News America discontinues supplying Plaintiff with periodicals is insufficient to support the granting of a preliminary injunction.

## C.

Finally, Plaintiff argues that the balance of hardships—the alleged loss of Plaintiff's business versus the temporary requirement that Defendant News America continue doing business with Plaintiff—tips decidedly in its favor. Plaintiff suggests that this Court should therefore grant a preliminary injunction even if the Court finds that another of the requisite elements for a preliminary injunction is not proven sufficiently. *See Mariani Giron v. Acevedo Ruiz,* 834 F.2d 238, 240 (1st Cir.1987) ("a finding attributing great weight to one of four components might make up for a relatively weak finding as to another").

■ Neither *Mariani Giron* nor *Lancor v. Lebanon Housing Authority,* 760 F.2d 361 (1st Cir.1985), require granting a preliminary injunction when a plaintiff makes a weak showing as to irreparable injury. The purpose of preliminary injunctions is to prohibit temporarily acts or events which are both imminent and extremely harmful. Where, as here, there is an insufficient showing as to both imminence and harmfulness, the very reason for granting a preliminary injunction disappears. In *Mariani Giron,* the Court of Appeals held that a very serious adverse effect on the public

interest might support denying an injunction when the plaintiff's "chances of success are good, but not of the highest...." 834 F.2d at 240. In *Lancor,* the Court of Appeals held that a strong showing by the plaintiff on the balance of hardships would compensate for a weaker showing on plaintiff's likelihood of success on the merits. 760 F.2d at 363. Neither of these precedents dictate a changed analysis or a different result in this case.

Further, Plaintiff has not made an especially strong showing that the balance of hardships tips in its favor. The Court has no evidence that a preliminary injunction in this case would do anything more than assure that ten percent of Plaintiff's business will continue. On the other hand, a preliminary injunction would require News America to continue doing business with a company which admits to having improperly secured confidential information from a News America employee. Defendant News America alleges that Plaintiff's alleged "bribery" of Martin Driscoll threatened News America's relationships with other independent distributors, and that any future relationship with Plaintiff might cause some other independent distributors to withhold their dealer guides. On this set of averments, this Court does not find an overwhelming balance of hardships favoring Plaintiff.

Accordingly, Plaintiff's Motion for Preliminary Injunction is DENIED.

SO ORDERED.

---

address the alleged promise by Defendant News America to provide *additional* periodicals to Plaintiff so that Plaintiff could solicit customers outside its traditional territory. *See* Complaint at ¶¶ 53–56 (Docket No. 1).