**ENVIROGAS INC., Plaintiff,**

and

**William B. Yeomans and Yeomans Energy Program, Inc., Plaintiffs-Intervenors,**

v.

**WALKER ENERGY PARTNERS and Walker Energy Operating, Ltd., Defendants.**

**No. CIV–86–268C.**

United States District Court, W.D. New York.

Aug. 13, 1986.

Moot & Sprague (Herman P. Loonsk, Richard F. Griffin, and Jeremiah J. McCarthy, of counsel), Buffalo, N.Y., for plaintiff.

Scolaro, Shulman, Cohen, Lawler & Burstein (William J. Leberman, of counsel), Syracuse, N.Y., for plaintiffs-intervenors.

Gibson, Dunn & Crutcher (Craig Carver, of counsel), Denver, Colo., Kavinoky & Cook (Allan R. Lipman, and Joseph E. Zdarsky, of counsel), Buffalo, N.Y., for defendants.

CURTIN, Chief Judge.

Plaintiff Envirogas, Inc., a New York corporation, is in the business of drilling gas wells and operating those wells on behalf of various limited partnerships or joint ventures which own an interest in the gas and oil produced from the wells. Defendants Walker Energy Partners and Walker Energy Operating, Ltd. [Walker], both of Texas, have a partnership interest in many of the wells operated by Envirogas. Plaintiff-intervenors William B. Yeomans and Yeomans Energy Program, Inc., also have a partnership interest in some of the wells.

Plaintiff commenced this action on March 21, 1986, seeking a declaratory judgment of the rights and obligations of the parties under several agreements. Plaintiff also sought a preliminary injunction preventing Walker from taking any steps to 1) collect any revenues directly from the gas purchasers, 2) audit Envirogas, or 3) dismiss Envirogas as the operator of any wells. Jurisdiction is premised on the diversity of the parties. 28 U.S.C. § 1332(a)(1).

On May 7, 1986, Walker sent a letter of termination to Envirogas, advising Envirogas that it would be removed as the operator of the wells in which Walker had a majority interest effective May 22, 1986. The letter also noted that Walker was informing gas purchasers of the change in operations (Item 9, Exh. F).

Envirogas has drilled approximately 1,400 wells. Of these wells, defendants have a partnership interest in approximately 1,130 wells (Item 5). Of this 1,130, Walker has a majority interest of the working-interest ownership (greater than 50 percent) in about 940 wells. These are the wells in which Walker is seeking to remove Envirogas as the operator. The approximately 200 remaining wells in which Walker has a minority interest are not at issue at the present time.

Envirogas produces a varying quantity of gas each month. It sells the gas primarily to two utility companies, National Fuel Gas [National Fuel] and Columbia Gas Transmission Corporation [Columbia], which make the payment directly to Envirogas. The gas companies make a payment each month for the gas used the previous month. For example, for gas taken by the utilities from mid-March through mid-April (April production), the gas company would pay Envirogas in mid or late May (Item 18, pp. 37–39). Envirogas would pay the partnership for this gas at the end of June.

According to this schedule, the partnerships receive their share of the revenues about 2½ months after the gas is taken from the wells (Item 18, pp. 40–46). When the gas companies received notice of the planned termination of Envirogas as the operator of many of the Walker wells, they were uncertain whether to make their monthly payments to Walker or Envirogas. Arrangements for the April, May, and June production payments were eventually made.

On May 15, Envirogas sought a temporary restraining order and preliminary injunction preventing the termination. The application for a restraining order was denied, and a hearing was held on plaintiff's motion for a preliminary injunction. At the conclusion of the hearing, the parties were given an opportunity to submit proposed findings and legal conclusions. Oral argument was held July 23, 1986. For the following reasons, plaintiff's motion for a preliminary injunction is denied.

A basic understanding of the operation of the business and the relationships of the various parties is essential. Many of these facts are undisputed (*see* Items 36 and 37). Envirogas engages in exploration, drilling, development, and production of gas and oil wells. To finance the drilling of the wells and the costs of their operation, Envirogas entered into agreements with either limited partnerships or joint ventures. A limited partnership consists of individuals or companies looking to invest in gas wells. The affairs of the limited partnership are handled by the general partners (Exh. 7).

Under the agreements with Envirogas, a partnership acquires all or some percentage of the "working interest" of a gas and oil lease. The working interest entitles a partnership to drill wells and produce gas at its expense and, in turn, to receive the net revenues from these operations (Exh. 7, p. 10). Under the agreements, the partnership paid a fee, known as the "turnkey price," to Envirogas for the drilling and completion of the well (Exh. 7, pp. 17–18). Included in the turnkey price was the connection of the well to the purchaser's pipeline (*see* Exh. 2, Vol. II, # 3, p. 2; and Vol. IV, Exh. 119, p. 3).

Each month, Envirogas, as the operator of the wells, collects a payment from all purchasers of the gas produced the previous month. These monthly revenues are substantial. For instance, the June 1986 production payment from Columbia amounted to $1,545,952.13. Walker's share of this was $323,669.99 (Item 35, Letter to Columbia). Only a portion of the monthly revenue attributable to gas produced from a given well is paid to the working interest owners of the well. A share of each month's revenues from each well is also paid to the holders of a royalty interest in the well.

In some cases, before drilling a well, Envirogas obtains a lease directly from the owner of the land on which the well is to be drilled. Envirogas pays a landowner a set percentage of the monthly revenues earned by that well. This is the landowner royalty payment, which usually comes to 12.5 percent of the monthly revenues. For its efforts in acquiring the lease, Envirogas receives its own "overriding royalty," usually totaling 12.5 percent of monthly payments.

In many instances, however, Envirogas is not the first party to acquire a lease. Instead, it may have been assigned by the landowner to a utility company, which in turn "farms out" the lease to Envirogas. Under this arrangement, Envirogas still pays the landowner royalty, and the utility company is entitled to a share of Envirogas's overriding royalty. On the average, Envirogas is left with an overriding royalty of 7 or 8 percent of the monthly production revenues for each well (Item 19, pp. 94–95).

After the royalties are paid, Envirogas deducts its monthly operating fee and any extraordinary expenses from the monthly revenues. "Extraordinary expenses" are not incurred on a monthly basis, but are for occasional services such as "tubing." The partnerships must pay for these expenses, in addition to paying their monthly operating fee. The classification of certain items as "extraordinary expenses," the need for those items, and who determines when the

expense is to be incurred are hotly debated by the parties. The money remaining after deduction of the fee and extraordinary expenses is divided among the partnerships according to their interest in the gas sold.

Several different entities may each own a percentage of the working interest of a well (Item 5, Exhs. A and E). As the operator, Envirogas markets the gas, entering into purchase agreements on behalf of the partnerships. Columbia and National Fuel pay Envirogas based on the amount of gas passing through a "tap" into their pipelines. The gas at any given tap point comes from several different wells, all connected to the tap through a system of collection pipelines. At the tap point, if the gas must be compressed to increase its pressure, the working-interest owners must bear the cost (Item 19, pp. 18, *et seq.*). Envirogas allocates the amount of revenue owing to each well, and this money is eventually distributed to the working-interest owners.

In November of 1985, the Walker defendants were assigned the working-interest ownerships of 175 limited partnerships (which, altogether, had an interest in the 1,130 wells) and succeeded to the agreements these partnerships had with Envirogas. A single master limited partnership was formed, headed by the Walker defendants (Item 11, Walker affidavit). Shortly thereafter, Walker began a review and examination of its wells and became concerned about Envirogas's performance as an operator (*see* discussion below).

Apparently fearing that Walker would attempt to remove Envirogas as the operator as a result of their disagreements, plaintiff filed this lawsuit. Walker's notice of termination of plaintiff as operator for all wells in which Walker has a majority interest (*see* Item 5, Exh. A) resulted in Envirogas's current application for a preliminary injunction.

The standards for granting a preliminary injunction are well established in this circuit. The movant must show:

(1) irreparable harm and (2) either

(a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the [movant].

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979).

### 1. Irreparable Harm

■ Envirogas claims that, if Walker were permitted to terminate the wells as planned, it would suffer harm which money damages could not compensate. As part of its asserted irreparable harm, Envirogas urges that the business will be "decimated" if an injunction is not granted. Envirogas predicts that more than 50 percent of its staff would be laid off, equipment would be sold at distress prices, wells would be "shut-in" and possibly damaged during the period in which they are kept inactive, and landowners and other working-interest owners would not receive prompt or accurate payment.

A careful review of the record, however, reveals that much of this harm would not come from the removal of Envirogas as the operator of Walker's wells, but from Walker's retention of the production revenues from those wells. In his initial affidavit in support of a temporary restraining order, John M. Clarey, President of Envirogas, makes this clear:

43. The gross amounts paid to Envirogas for the gas it markets for all wells and all programs is currently at a monthly level of $2,500,000 to $4,000,000. Of this, Columbia pays approximately $1,600,000 to $2,500,000 and National (including end-user sales), approximately $400,000 to $500,000, with the balance paid by several other purchasers. The wells in which Walker claims an interest are responsible for producing approximately 35%–40% of these sales before expenses.

44. ... If Walker follows through in its announced intention to interfere with the payments of the gas purchasers and the purchasers hold the money or do not pay it to Envirogas, this will cause significant irreparable harm. The purchasers

could well assert the right to hold up all dollar payments of any amount for gas for beyond any amounts in which Walker could claim an interest.

Clarey goes on to state that the Walker take-over of operations and "interruption of cash flow from the gas purchasers" will cause layoffs (¶ 46). During the hearing, Mr. Clarey testified that certain expenses for the operation of the wells are paid a couple of months in advance so that, if the relationship were cut off at any given point, Walker would owe Envirogas money. (Item 18, pp. 46–47) The layoffs would be "much more severe" if gas purchasers withheld all money (Clarey Affidavit, ¶ 48).

Mr. Clarey's testimony at the hearing highlights this distinction:

> If Walker took over the wells, that would shrink the business, but if he holds the money up and we can't pay our payroll, that could very well have an absolute effect of destroying the business.

Item 19, p. 86.

An orderly take-over of the wells by Walker will have a serious impact on Envirogas's business, but there is no reason to believe that an appropriate method of payment of Envirogas's share could not be put into place promptly. Nor has there been evidence to show that delivery to gas purchasers or consumers will be impaired.

Envirogas relies on cases involving the threatened termination of a dealership in which a dealer obtained a preliminary injunction pending the outcome of the proceedings. However, the dealership cases differ in several material aspects from the case at bar.

In the dealership cases, the granting of injunctive relief is often bottomed on the nature of the relationship between the dealer and the franchiser. The franchiser is frequently a powerful national or international corporation, while the dealer is a small businessman. In *Semmes Motors Inc. v. Ford Motor Company*, 429 F.2d 1197 (2d Cir.1970), Ford was enjoined from terminating a dealership owned for some 20 years by William Semmes. The court noted that money damages would be inade-

quate compensation, since Mr. Semmes and his son, who was to take over the dealership, wanted to continue running the business. If Ford were permitted to terminate the dealership before resolution of the merits, the Semmes' business would be obliterated. On the other hand, Ford faced little harm from the granting of the preliminary injunction—suspected fraudulent activities conducted by Semmes had been discovered and remedied.

Similarly, *Roso-Lino Beverage Distributors v. Coca-Cola Bottling Co.*, 749 F.2d 124 (2d Cir.1984), involved a "Mom and Pop" shop. The court approved the grant of a preliminary injunction forbidding Coca-Cola from terminating the distributorship pending resolution of the case. Termination would have destroyed the business which had been the couple's livelihood for 11 years. In contrast, Coca-Cola's harm in maintaining the dealership was relatively slight. *See also Interphoto Corporation v. Minolta Corporation*, 417 F.2d 621, 622 (2d Cir.1969).

In the instant case, there is no such disparity between the parties. Both Envirogas and Walker are large corporations doing business in several states. Refusing to grant a preliminary injunction in *Semmes, supra,* and *Roso-Lino, supra,* would have put the individuals out of business. That is not the case here. Arrangements have been made and are proposed for the distribution of revenues, as is discussed further below. Envirogas will continue as the operator of the wells in which Walker has less than a majority interest, as well as those wells in which Walker has no interest. The parties agree that Envirogas will continue to receive both its royalty interest and its own working interest in the Walker wells. It is undisputed that Envirogas is entitled to charge the Walker wells a fee for the transmission of gas through certain pipelines and for the compression costs. The court is confident that the parties will arrive at an agreement on the fees for these costs, pending resolution of the lawsuit, without court intervention.

Any damages sustained by Envirogas will be compensable in money damages. If Envirogas is wrongly or prematurely terminated, it will lose its monthly operating fees, which are fixed and therefore able to be calculated. Also, despite repeated requests by the court during oral argument, plaintiff could not state why damages from layoffs and a reduction in the size of the business could not be calculated.

During argument, counsel for Envirogas urged that although the operating fees are fixed, there is an element of lost profits which can never be calculated and, therefore, is irreparable. See Interphoto, 417 F.2d at 622. Envirogas's royalty interest and working interest in the Walker wells are not fixed; they are a percentage of the production revenues. It is undisputed that all operators of wells are not equally qualified, and that some might turn a higher profit than others. Envirogas urges that if Walker were to substitute another, perhaps inferior, operator, the adverse effect on profits would not be calculable.

This would, undoubtedly, be a difficult task, but the court is not convinced that it is insurmountable. For example, it may be possible for Envirogas to compare its records of a given well's past performance with that well's performance under a new operator.

Plaintiff also claims that, if Walker is permitted to terminate Envirogas as the operator of the wells, Envirogas's reputation in the oil and gas field will suffer irreparable harm (citing Dino DeLaurentiis Cinematografica, S.P.A. v. D–150, Inc., 366 F.2d 373, 375–76 (2d Cir.1966)). Ironically, it appears to the court that a large part of the predicted damage to Envirogas's reputation has already been suffered, due in part to the termination notice and in part to the very filing of this lawsuit and the application for preliminary relief.

When Envirogas first sought a temporary restraining order, it noted that the company had received numerous inquiries from other partnerships, investors, subcontractors, and banks concerning its continued viability in view of the "announcement of the termination" (Item 22, Plaintiff's Post-Hearing Memorandum) (see Clarey Affidavit, Item 6). During the course of the hearing, Walker raised serious questions about Envirogas's accounting practices, management of the wells, and its financial footing. The court itself has received inquiries from other companies (or their attorneys) who have an interest in Envirogas's status. Any further damage to plaintiff's reputation as a result of a denial of a request for injunctive relief would appear to be minimal.

Finally, the dealership cases cited by plaintiff had yet another distinguishing factor: the potential harm to the franchiser in continuing the relationship was slight. Here, on the other hand, if even some of the serious allegations raised by Walker are proven to be well-founded (which is not clear at this point in the proceedings), Walker could suffer substantial harm by the grant of an injunction.

The court notes that the parties have each proposed versions of an escrow agreement whereby an escrow agent would collect the revenues directly from the gas purchasers. The agent would distribute the money according to a plan devised by the parties. Once the parties agree upon a final version of this agreement, which the court is confident can be accomplished without its intervention, any potential harm resulting from a delay in disbursing production revenues will be averted.

In fact, before argument on the motion, the parties reached an interim agreement permitting the utility companies to distribute certain revenues (Item 35). Columbia and National Fuel were given instructions to distribute a portion of the April and May production revenues, which had been retained by the gas companies, to Walker. They were also told how to divide the June revenues between the parties. At this point, there are no arrangements for the July production revenues.

In the court's view, Envirogas has failed to meet its burden in showing irreparable harm so as to justify the granting of a preliminary injunction.

*2(a) Likelihood of Success on the Merits*

■ Envirogas maintains that, under the agreements with the partnerships, it has a right to continue as operator for the productive life of the wells. Only if there is gross mismanagement or insolvency, according to Envirogas, may Walker terminate Envirogas as the operator. Walker urges that many of these agreements are either terminable at will or after a prescribed period which has already passed, or for cause. It is not necessary at the present time to reach a conclusion as to the legal merits, but simply to formulate an initial assessment. Based on the current record, it appears unlikely that Envirogas will prevail on this point.

At the time the master limited partnership was formed, Walker succeeded to a series of agreements with Envirogas. The terms of the agreements varied. The 1977 agreements had no term governing the duration of the agreement. The agreements from 1978 through 1981 have no explicit durational term, but provide for renegotiation of the monthly operating fee at set intervals ranging from one year to three years.

The 1982–84 agreements are the first which explicitly provide for the resignation or removal of the operator. Some of these agreements provide that the operator may resign at any time, simply by giving written notice to the partnership (Exh. 2D, # 129, ¶ 2). Others provided the Envirogas could resign only for good cause shown (Exh. 2D, # 136, ¶ 2). All required the partnership to have cause before it could remove Envirogas. All required 90 days' notice before Envirogas resigned or the partnership removed Envirogas (Exh. 2D, ## 127–41).

Walker maintains that its relationship with Envirogas is one of principal-to-agent and that, as such, Walker has the right to terminate Envirogas as the agent at any time. Walker relies upon *Reserve Oil v. Dixon*, 711 F.2d 951 (10th Cir.1983), in which the court found that the operator of oil wells served in a fiduciary capacity, as a trustee, to the working-interest owners (*citing Young v. West Edmond Hunton Lime Unit*, 275 P.2d 304 (Okl.1954), *appeal dismissed*, 349 U.S. 909, 75 S.Ct. 600, 99 L.Ed. 1245 (1955)).

The decision in *Reserve Oil* must not be given too broad a sweep, since it is based upon the specific operating agreements at issue in that case. *Id.* at 952–53. Nonetheless, it provides a useful analogy.

In analyzing the operating agreements and working-interest acquisition agreements in the instant case, it is most helpful to look to the 1982–84 agreements. The agreements in 1977 were scant, and Envirogas committed more of the terms of its arrangements to writing as the years passed. The operating agreement of December 30, 1982, is representative (Exh. 2D, # 129). It provides that the partnership is the owner of certain leasehold rights, and that Envirogas is designated as the operator to produce the wells for the account of the partnership (Preface and ¶ 1). The wells "are and shall be owned and operated for the benefit of the partnership and all costs and expenses in connection therewith shall be borne by the partnership" (¶ 11).

The partnership has the right to take its share of the gas and oil and separately dispose of it (¶ 12). If the partnership does not take its share, Envirogas arranges for the sale of the gas. Envirogas collects the proceeds from the sale of the gas, holds it in a bank account for the benefit of the partnership, and distributes it at regular intervals. It must make regular reports to the partnerships (¶¶ 8 and 9). Although the agreement describes Envirogas as an "independent contractor" (¶ 13), it appears likely from all of the terms of the contract and from the nature of the relationship as developed through the hearing that Envirogas is acting in a fiduciary capacity. Envirogas has contracted to manage the properties of the partnership for the benefit of the partnership. It is in a position of trust, whereby it must use its expertise for the benefit of the working-interest owner.

In New York, contracts of exclusive agency or employment which have no dura-

tional term are terminable at will. *Haines v. New York City,* 41 N.Y.2d 769, 396 N.Y.S.2d 155, 364 N.E.2d 820 (1977); *Murphy v. American Home Products,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983). Since it appears that Envirogas was Walker's agent, Envirogas could be terminated at any time under the 1977–81 agreements, which have no durational term.

The 1982–84 contracts do provide a durational term. Those which require Walker to have good cause for terminating Envirogas but permit Envirogas to resign simply by giving notice lack mutuality and would probably be terminable, with notice, by Walker. Under those agreements which required both sides to have good cause before termination, Envirogas has not shown that it is likely to prevail based on the serious allegations made by Walker as to Envirogas's fitness as operator (*see* discussion below). And, although Walker did not give Envirogas the required 90–day notice, advising Envirogas of the termination just two weeks before the proposed May 22, 1986, effective date, 90 days have now passed since the notice of termination.

Envirogas urges that it was not Walker's agent. The agreements, it argues, were contracts in which Envirogas gave Walker the working-interest ownership in consideration for Envirogas's operating the wells for their productive life. Mr. Clarey testified to this understanding at the hearing. Even if Envirogas is correct in alleging that there is no agency relationship here, but merely one of traditional contract, New York courts are reluctant to find that contracts without durational periods are to be perpetual. They look to the intent of the parties and the surrounding circumstances. *Haines,* 41 N.Y.2d at 772–73, 396 N.Y.S.2d 155, 364 N.E.2d 820.

Envirogas points to the phrase "exclusive operator," which appears in several agreements, as evidence that Envirogas was to operate the wells perpetually. However, there is nothing to indicate that "exclusive" did not simply mean the sole operator at any given time. In fact, there are indications that Walker did not intend, in the agreements it entered into with Envirogas, that Envirogas was to be the operator of the well for the productive life of the well. Exhibit 7 is a 1982 offering memorandum from Walker, as a general partner, to prospective limited partners. Included is a definition of "operator," followed by the sentence: "The *initial* Operator of the wells ... will be Envirogas Inc., a New York corporation, under the terms of the Working-Interest Acquisition Agreement attached hereto...." (¶ 9 (emphasis added)).

Although there are litigable questions as to the nature of the relationship of the parties and their intent under the agreements, as well as to whether Walker had cause under some of the agreements, Envirogas has not shown a likelihood that it will succeed on these issues.

Finally, Envirogas urges that Walker cannot take over any wells in which it owns less than 100 percent of the working interest without first obtaining the consent of all the other working-interest owners. The working interest owners are neither partners nor agents, but co-tenants. *Britton v. Green,* 325 F.d 377 (10th Cir.1963).

Walker seeks to terminate Envirogas as the operator of the wells in which it owns more than 50 percent of the working interest. It has represented to the court that it will obtain the approval of the working-interest owners who have substantial interests in the wells at issue. If any of the other working-interest owners are dissatisfied with Walker's selection for a new operator, or any other aspect of this proceeding, they may intervene in this action.

The court has granted an application for intervention on the part of William B. Yeomans and Yeomans Energy Programs, Inc., which have a minority interest in many of the wells in which Walker holds a majority interest. Because the Yeomans intervenors did not seek intervention until one week before final arguments were heard (although Mr. Yeomans testified at the hearing weeks earlier), they were not per-

mitted to participate in the motion for injunctive relief.

It appears to the court that no harm will come to minority interest holders if Walker is allowed to act at the present time. They may protect their interests through intervention.

### 2(b) Issues for Litigation and the Balance of Hardships

In addition to the contractual issues, Walker raises several serious allegations of negligence, mismanagement, and even fraud on the part of Envirogas. If true, these allegations would provide cause for the removal of Envirogas as operator under all of the agreements.

Two of Walker's major concerns involve "take or pay" and "section 110" payments. As far as the "take or pay" arrangement, Envirogas had agreements with Columbia that the company would take a set quantity of gas each year. The volume of gas Columbia did not take would be paid for in that year at the current prices. As was testified to by Wilson Wray, Envirogas's Vice President of Accounting, Columbia would then have a right to recoup the gas in future years (Item 21, p. 120). The working-interest owners were not advised when payments were made under these agreements, nor were they given the money until after the recoupment occurred (Item 21, pp. 123–24). During this interval, the money was kept in a non-interest bearing account (Item 25, p. 11).

Walker's complaint is that, when it was eventually paid the money, it was paid at the prices set during the year of recoupment. For example, when Columbia made the payment in June 1984, the cost of gas was approximately $5 per unit (Exhs. 52 and 53). When the gas was recouped in January 1986, the cost per unit had dropped to almost $3.50. Envirogas paid the working-interest owners at the $3.50 rate (Item 21, pp. 124–27).

Walker contends that Envirogas unlawfully converted the approximately $1.50 per unit. Envirogas maintains that, if the price of gas had risen, not fallen, Walker would have received the higher price, since the partnerships are paid the price prevailing at the time of recoupment. Envirogas maintains that paying the partnerships at the time Envirogas receives the "take or pay" money is not possible, since Envirogas does not know from which wells the gas will be drawn and, therefore, who is entitled to the proceeds.

While the "take or pay" payments are made pursuant to agreements with purchasers, "section 110" payments are authorized by federal law. 15 U.S.C. § 3320, or "section 110." Under 15 U.S.C. § 3320(a)(2), a seller of natural gas is permitted to charge a price in excess of the maximum lawful price in order to cover the costs of compressing, treating, and transporting the gas.

Envirogas collected these section 110 payments from the purchasers, but did not forward the payments to the partnerships. Envirogas claims to have had an oral agreement with the then administrator for the partnerships, Martin Lacoff, by virtue of which Envirogas would retain the section 110 payments to cover transmission costs owed by the partnerships (Item 21, pp. 96 and 103–107). Walker disputes the existence of this agreement, claiming that Envirogas had a duty to forward the section 110 payments to the partnership. It also disputes Envirogas's claim that Envirogas suffered a loss through this system (Exh. 51).

Another major concern for Walker are mechanics liens placed on wells in which Walker has an interest. The first lien was obtained by an Ohio company, Lomack Petroleum, Inc. Envirogas obtained between $200,000 and $220,000 per well from various partnerships, including Walker, for the drilling of 36 wells (Item 19, pp. 186–87). Envirogas subcontracted the drilling work to Lomack, which charged Envirogas approximately $170,000 per well (Item 19, p. 185). Mr. Clarey testified that he thought that this price was too high. As a result of Envirogas's dispute with Lomack, the properties were liened in December 1985 (Item

19, p. 188). Walker, which was not informed of the liens attaching, has not received its share of the revenues from those wells.

Other wells were liened by Belden and Blake Corporation, successor to a company with which Envirogas had subcontracted to operate those wells. Walker had an interest in 64 of the liened wells (Item 19, pp. 192 and 195). Envirogas justified these liens by noting that the disputed money involved operating costs which would have been passed onto Walker. Clarey testified that it was Envirogas's duty, as a prudent operator, to dispute the Belden and Blake payments (Item 19, p. 194).

Walker claims that it had a right to be told immediately of the attachment of the liens. The court notes that, while the Lomack lien was filed in December, the Belden and Black lien was filed just prior to the hearing. This gave Envirogas little opportunity to notify anyone about the Belden and Blake lien.

Walker also claims that, in permitting the liens to attach and in failing to have the liens "bonded off" by a surety (Item 18, pp. 192–94), Envirogas put its own interest ahead of those of the working-interest owners. Envirogas disputes the need to "bond off" the liens, since the properties were not threatened with foreclosure.

Throughout the hearing, Walker raised several other objections to Envirogas's method of operation. Walker challenges Envirogas's method of operation. Walker challenges Envirogas's claimed right to unilaterally decide when a well should be "plugged and abandoned" at the expense of the partnership. Once a well is plugged and abandoned or closed down, it reverts to Envirogas (Exh. 20). Walker also claims that Envirogas should not have the right to decline to "shut-in," or temporarily turn off, a well which is losing money for the partnership. Envirogas contends that these decisions are made for technical reasons, not financial ones.

Walker also challenges Envirogas's method of accounting by which it incurs expenses two or three months ahead of

obtaining revenues, and of Envirogas's asserted authority to determine when to incur certain items of extraordinary expense, for which the partnership must pay. Another issue brought out at the hearing is Walker's belief that Envirogas has failed to consult with Walker as to both financial and operational decisions. Envirogas continues to assert that it has no such duty. Finally, Walker contends that, based upon financial records (filed under seal), Envirogas is insolvent—a point hotly contested by Envirogas.

For its part, Envirogas disputes Walker's alleged full or partial ownership of the pipeline in the gathering systems. This must be resolved during the litigation. For the present, Walker has agreed that it is responsible for certain transmission costs.

■ At this point, the court is making no decision as to the merits of these issues. There has been only a brief hearing, and the parties have had little opportunity for discovery. Many of Walker's concerns appear legitimate, while Envirogas's justifications may be sound. It is clear that these questions are sufficiently serious issues going to the merits to make them fair grounds for litigation. However, based on all of the above, the balance of hardships does not tip decidedly in favor of Envirogas. On the contrary, if an injunction is granted, it may impose severe hardship on Walker.

Envirogas has failed to meet its burden to justify injunctive relief. The motion for preliminary relief is denied.

*Protective Order*

During the hearing on the motion for preliminary relief, Envirogas claimed that a protective order was essential for its financial records and for testimony regarding those records. In light of the press of time, which made full discussion of this issue impossible, the motion was granted. It was later modified so that Walker and its attorneys were permitted to review the records and testimony, but only for the purposes of this litigation. The documents were not to be shown to any third parties.

Walker has now moved to rescind the protective order. During final argument on the motion for an injunction, I indicated that the order should be modified to permit the Yeomans intervenors, now parties to this action, to view the documents subject to the same limitations. It was agreed that Envirogas would explain its position on this issue and justify maintaining the protective order once the decision as to preliminary relief was issued. On or before August 20, 1986, Envirogas shall make the required filing. Walker shall have until August 29, 1986, to respond.

In summary, Envirogas's motion for a preliminary injunction is denied. Walker's motion to rescind the protective order is held for the present; plaintiff shall submit further papers on this issue on or before August 20, 1986.

The court reiterates that this is simply a denial of a request for preliminary relief and is in no way a decision on the merits, which must await further proceedings.

So ordered.