WALTER MATTER, S.A., TEXTILE AGB, S.A., JOSE TOYO, S.A., GIL MAS, S.A., INCA TOPS, S.A., SCHWEIZ INSURANCE, SITIP COTTON, S.P.A., SIT TRANSPORTES INTERN, S.A., UNION IBEROAMERICANA, Plaintiffs

v.

THE M/V MAR, THE M/V WITTUG, their engines, boilers, tackle, furniture, apparel, shipping containers, etc. in rem, ACHILLE LAURO LINES, S.R.L. d/b/a LAURO LINES, CHARTER TRANS-PORT LINE, INC., WEST INDIES TRANSPORT CO., INC., WEST INDIES TRANSPORT LIMITADA, S.A., WALDRIC, LTD., WITWA-TER CORPORATION, IN PERSONAM, Defendants

Civil No. 1990-341

FABRICA DE TEJIDOS LA BELLOTA S.A. INVERSIONES Y SER-VICIOS S.A. EMPRESA NACIONAL DE COMERCIALIZACION DE INSUMOS, SELCCO S.P.A. TRANSATEX S.P.A. MADAL S.P.A. MANIFATTURA DE LEGNANO SP.P.A. CAMCOTTON S.A. COMPANIA DE XEGUROS CRUX DEL SUR S.A., Plaintiffs

v.

THE M/V MAR and THE M/V WITTUG, their engines, boilers, tackle, furniture, apparel, shipping containers, etc. in rem, ACHILLE LAURO LINES S.R.L. d/b/a LAURO LINES, CHARTER TRANSPORT CO., INC., WEST INDIES TRANSPORT LIMITADA S.A., WALDRIC LTD. and WITWATER CORPORATION, IN PER-SONAM, Defendants

Civil No. 1989-357

District Court of the Virgin Islands

Div. of St. Thomas and St. John

July 14, 1992

GREGORY H. HODGES, ESQ. (DUDLEY, TOPPER, FEUERZEIG), St. Thomas, V.I. and MACHALE A. MILLER, ESQ. (O'NEIL, EICHIN, MILLER & BRECKINRIDGE), New Orleans, LA., *for plaintiffs*

FREDERICK G. WATTS, ESQ. (WATTS & STREIBICH), St. Thomas, V.I. and ALAN VAN PRAAG, ESQ., WILLIAM D. HUMMELL, ESQ. (SNOW BECKER KRAUSS P.C.), New York, New York, for *defendant Achille Lauro Lines, s.r.l.*

SUSAN BRUCH MOOREHEAD, ESQ. (GRUNERT, STOUT, MOORE & BRUCH), St. Thomas, V.I., *for defendants Charter Transport Line, West Indies Transport Co., Inc., West Indies Transport Limitada S.A., Waldric Ltd. and Witwater Corporation*

KAUFMAN, *Senior U.S. District Judge*, Sitting by Designation

Plaintiffs, South American Shippers or their successors in interest, caused cargo to be placed aboard the M/V MAR, a vessel owned by Waldric, Ltd. and chartered[1] to Charter Transport Lines, Inc., a Panamanian corporation, and subchartered by Charter Transport to Achille Lauro Lines, an Italian corporation. Plaintiffs seek damages for the alleged tortious loss of their cargo. In response, defendant Achille moves for dismissal, asserting a lack of in personam jurisdiction because none of the Virgin Islands' jurisdictional statutes apply and because Achille does not have sufficient minimum contacts with the Virgin Islands to meet the requirements of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. In addition, Achille contends that the bills of lading governing the shipment of plaintiffs' cargo contain a forum selection clause which provides for litigation in Italy of any claims arising out of the carriage.

For the reasons set forth in this opinion, this Court concludes that plaintiffs have not made a prima facie showing that any negligent repair took place in St. Thomas. Further, the affidavits and other papers filed in this case do not amount to prima facie proof by plaintiffs that the repair in St. Thomas—negligent or other-

---

[1] The charter arrangement between Waldric and Charter Transport apparently was a "bareboat" charter in which the charterer takes over all operations of the vessel and exercises, in effect, the rights of the vessel's owner. See Grant Gilmore & Charles L. Black, The Law of Admiralty § 4-1, at 194 (2d ed. 1975).

wise—was the proximate cause of the MAR's sinking. Alternatively, even if personal jurisdiction over Achille is present and were exercised in this case, Achille is entitled to enforce the forum selection clause in the bills of lading executed by plaintiffs' predecessors in interest.

## FACTS

Plaintiffs' cargo shipments originated in Chile and Peru and were bound to ports in Spain and Italy. Once in the Atlantic, en route from South America to Spain and Italy, the MAR became disabled and its manager, West Indies Transport Company, Inc., a Virgin Islands corporation with its principal place of business on St. Thomas, decided to have the vessel towed to Spain in a "dead" condition. Witwater Corporation, also a Virgin Islands corporation, was hired to handle that towing. After the towing commenced, the MAR sank, allegedly in relatively calm seas, off Anguilla in the British West Indies.

Although the cargo neither originated in nor was destined for the Virgin Islands, plaintiffs base their claim that the Virgin Islands has in personam jurisdiction over Achille upon the fact that en route from Italy to South America the MAR deviated from its route and was brought into St. Thomas for repairs—which repairs, plaintiffs allege, were negligently made and which negligence, plaintiffs allege, was the proximate cause of the MAR's sinking two months later during its return trip while carrying plaintiffs' cargo.

Plaintiffs argue that Achille, either directly or through its agent, the vessel's Master, breached its duty to provide to plaintiffs a seaworthy vessel to transport the cargo because the repairs made in St. Thomas were negligently made and because Achille failed appropriately to oversee those repairs and assure that they were properly made.

Achille, on the other hand, contends that the MAR deviated to St. Thomas at the direction of the ship owner and that this particular activity was outside the scope of agency, if any, between Achille and the ship owner—that Achille simply time chartered the ship to transport cargo. In that context, Achille takes the position that under the time charter party, it simply provided the itinerary for the duration of the charter period. While the Master is responsible to the charterer with respect to carrying out the charterer's instructions for making port calls, any activity having to do with the good

of the vessel itself, such as operations, maintenance and navigation, remains the responsibility of the ship owner. See Grant Gilmore & Charles L. Black, supra n.1, at 194.

Thus Achille argues that the decision to divert into St. Thomas for repairs was not made by it and that the notification it received about the diversion was only for the purpose of permitting it to determine how much time, if any, to consider the ship off hire for the purpose of computing the amount of money that would ultimately be owed for the duration of the charter. In sum, Achille asserts that the Master and Charter Transport were not its agents in making the decision to divert into St. Thomas.[2]

Achille further argues that plaintiffs have presented no evidence indicating that the repairs made in St. Thomas were negligently made or, more importantly, that the repairs were in any way connected to the cause of the MAR's sinking.

As addressed in detail infra, in the face of a defendant's challenge to personal jurisdiction, the plaintiff has the burden to make a prima facie showing that such jurisdiction exists. Because of that fact-based inquiry, what follows in this opinion is a somewhat detailed outline—taken from the affidavits filed in this case—of the MAR's movements and its associated problems from the time it came under charter until it sank.

■ The MAR apparently was located in Gibraltar when it came under charter.[3] From Gibraltar it went to Brindisi, Italy and from Brindisi to La Spezia, Italy. The vessel's Master, Captain Crawford, first joined the ship in La Spezia on July 14, 1989. According to Captain Crawford's unsworn statement, when he initially joined the ship, "she looked in fairly good condition and caused me no concern."[4] Upon leaving La Spezia, the MAR traveled to Marseille,

---

[2] In making the assertion, Achille relies on the provisions of the charter party agreement. However, plaintiffs contend that the charter party governs only the relationship between Achille and Charter Transport and does not apply to third parties such as plaintiffs. In accordance with the terms of the bills of lading, Achille owes plaintiffs a duty of due diligence in providing a seaworthy vessel to transport their goods. At best, plaintiffs state, the time charter party reflects Achille's decision to delegate that duty to Charter Transport and may shed light on whether Achille has a right to be indemnified by Charter Transport if Achille is found to have breached its duty of due diligence.

[3] See Affidavit of James Christopher Gosling, Exh. JCG 3, Schedule of the MAR.

[4] Id., Exh. JCG 1 (unsworn statement of Thomas Flemming Crawford prepared for

France then to Valencia, Spain and then to Gibraltar. Captain Crawford hired Donald Michael Hogan in Gibraltar as Fourth Engineer,

---

his signature by the Owners' P & I Club) ("unsworn P & I Club statement"), at 3. According to Solicitor Gosling's affidavit, after he had completed taking a statement, Captain Crawford left for lunch, agreeing to return to sign the full statement Solicitor Gosling was going to prepare during the lunch break.

To my surprise, [Captain Crawford] telephoned at about 4 o'clock to say that he was not feeling very well and that he would be going straight home to Scotland. Although I do not know this to be the case, I suspect he may have spoken to the P & I Club during that lunchtime and they had told him that he should sign no documents. He had been quite happy earlier to return to my office and sign a statement.

Affidavit of James Christopher Gosling, at 3.

On March 30, 1992 this Court addressed the following Memorandum and Order to counsel:

It is to be noted that unsworn statements of Captain Crawford have been submitted by plaintiffs. No objection to their submission in that manner has been filed by any parties hereto. However, unsworn statements de not comply with the provisions of Rule 56(e). Accordingly, this Court may not, and will not, consider the statements of Captain Crawford unless there is consent by each and all of the parties. This Court will understand that each and all of the parties do so consent unless one or more of them indicates otherwise, in writing, before the close of business on April 13, 1992.

On April 13, 1992, counsel for Achille objected to this Court's considering Captain Crawford's unsworn statements. Thereafter this Court filed further Orders, and counsel for plaintiffs and Achille filed further documents, in which the main emphasis was upon the taking of the depositions of Captain Crawford and/or of Solicitor Gosling. However, before any such deposition could be taken, Achille seemingly instituted proceedings in a court of Italy, a proceeding which Achille's counsel in this case has described as similar to a chapter 11 bankruptcy proceeding in the United States. On that basis, counsel for Achille has informed this Court of their intention to seek to withdraw as counsel of record in this case as soon as they can obtain further information with regard to the aforementioned litigation in Italy.

Under the circumstances, in view of the seeming unavailability of Captain Crawford and the lack of any counsel able to proceed on behalf of Achille in connection with the taking of any deposition of Solicitor Gosling, this Court concludes that it has discretionary authority under Fed. R. Civ. P. 56(f), see 10A Charles A. Wright et al., Federal Practice & Procedure § 2738, at 507–08 (1983), and Fed. R. Evid. 804(b)(5), see Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence ¶ 804(b)(5)[01], at 804–173 (1991), to consider the unsworn statements of Captain Crawford, as if Captain Crawford had filed an affidavit with respect to them. However, even if no consideration whatsoever is given by this Court to anything set forth in Captain Crawford's statements, the record in this case requires the same conclusions which this Court has reached in the within opinion. That is so not only because of the deposition

although Mr. Hogan was qualified as a chief engineer.[5] According to Captain Crawford, "In Gibraltar . . . we suffered the usual small engine room mechanical problems. There were obvious fuel pump, generator and oil filtration problems."[6] From Gibraltar, the MAR sailed for Guatemala.

"During the voyage we suffered major problems with the generators and called in to St. Thomas, Virgin Islands as the nearest port of refuge [in August 1989]. Technicians from a Florida company came aboard and repaired the generators . . . ."[7] While the MAR was in St. Thomas, Captain Crawford promoted Mr. Hogan to Chief Engineer. Upon leaving St. Thomas, the MAR headed for Guatemala, "during which time the generators were okay but then the vessel suffered fuel pump problems."[8] The MAR then traveled from Guatemala through the Panama Canal to Callao, Peru where it discharged its European cargo and loaded additional cargo.

Upon leaving Peru, the MAR went to San Antonio, Chile where it discharged cargo and took on more cargo. While the vessel was docked at San Antonio, "both engines were inoperative with the engineers working to make the necessary repairs. . . . Engine repairs were completed on the 20th [of September] and the vessel shifted berths . . . ."[9] On September 23, the MAR was advised to proceed to Callao to take on more cargo. Captain Crawford "advised New York that [the] port engine was in danger of losing power because of fuel pump failure."[10] While en route to Callao on September 25, the steering engine failed.[11]

According to Captain Crawford, the following occurred from and after the MAR's arrival at Callao:

—
testimony of Mr. Hogan, but also because, whether or not any statement by Captain Crawford is considered, plaintiffs have not borne the burden, in the face of Achille's challenge to personal jurisdiction, of making a prima facie showing that such personal jurisdiction exists. See the discussion infra in the body of this opinion at pages 259–261.

[5] See id. at 4.

[6] Id.

[7] Id.

[8] Id.

[9] Unsworn Master's Report Commencing at Beginning of Northbound Voyage (hereinafter "Unsworn Master's Report), at 1, Exh. JCG 5. See supra n.4.

[10] Id.

[11] See id. at 2.

On the 26th of September we arrived at anchor at Callao. On the 27th vessel was unable to go alongside as scheduled because of engine problems. The basic problem was generators and electrical engineers were brought on board to effect repairs. . . . Repairs were completed on the evening of the 27th and vessel ready in all respects to sail.

. . . On the 29th operations were completed and we departed Callao. We were now under manual steering and heading for Panama Canal.

On the 1st of October port engine was stopped to effect repairs to the fuel pump. I advised New York of our difficulties with fuel pumps, generators, steering motor, filtration system.

The vessel arrived at anchor at Balboa (Panama] on the 4th of October. Mr. Dieter Reizer came on board to effect repairs on the port engine fuel pump. . . . Still at anchor on the 5th of October the steering motor was sent ashore for re-winding.

. . . The transit of the canal got underway in the evening [of October 6] and we arrived at anchor at Cristobal [Panama] on the 7th of October. On the last engine movement on arrival the port main engine fuel pump broke down. During the day the fuel pump was repaired and the steering motor reinstalled and vessel was made ready to sail. At 2000 vessel sailed for Valencia, Spain. On the 8th of October after discussions with New York it was decided to direct the vessel to St. Maarten Netherlands Antilles to effect repairs on the port main engine fuel pump.

The vessel arrived at anchor off Philipsburg [St. Maarten] on the 12th of October. A replacement port fuel pump was then installed and the starboard fuel pump was also checked by Dieter and these repairs were completed to the Chief Engineer's satisfaction.

. . . .

On October 21st the vessel was made ready for sea in all respects and sailed from St. Maarten for Valencia [Spain]. Problems with rebuilt fuel injection pump experienced almost immediately. In the early hours of the 22nd the steering motor broke down and we were forced to revert to hand steering. . . . Chief Engineer reported a leak in the starboard rudder stock and advised there is a possibility of turning back.

On October 23rd at 1000 I made the decision to return to St. Maarten. . . . Port main engine fuel pump back to previous prob-

lem. Starboard main engine fuel pump exhaust valves and turbo charger giving trouble. . . . At 10 miles off St. Maarten all engines stopped and vessel adrift. Engineers advised me unable to repair the fuel pumps effectively and unable to start engines. WITTUG arrived with Mr. David Staples of Maritime Enterprises, Inc. to examine rudder stock leak and advised the vessel would be prepared and towed to dry dock in Mediterranean by WITTUG tug.

Id. at 2–3. According to Captain Crawford's unsworn P & I Club statement,

On the voyage from Callao to Balboa the starboard rudder stock had been leaking as there was about 2–3 milimetres of play . . . . On the voyage from Cristobal to Philipsburg the leak got worse. There was about 10 milimetres play in the starboard rudder stock and therefore I estimate we were taking on about 2–3 tons of seawater per hour. I believe that the maximum tolerance should have been about .6 of a milimetre and this had increased to about 10 milimetres which was unsatisfactory.[12]

Captain Crawford also observed, "When at anchor in Callao there was a sea coming from astern and a small amount of water could enter through the stern door."[13]

On October 26, the WITTUG towed the MAR back to St. Maarten where it anchored off Marigot. On October 28, the MAR was rigged for towing and by the morning of October 29, all arrangements for the tow had been completed and Captain Crawford left the vessel. The MAR sank on November 11, 1989.

In addition to Captain Crawford's unsworn P & I Club statement and his unsworn Master's Report, plaintiffs have filed the transcript of a deposition of Mr. Hogan, the vessel's Chief Engineer from the time the vessel was in St. Thomas until its sinking. The following is taken from Mr. Hogan's deposition testimony.

Mr. Hogan began his employment as a fourth engineer aboard the MAR in Gibraltar. Prior to agreeing to that employment he examined the condition of the engine room, which he found to be "reasonable."[14] At that time, he found that "one of the alternators"

---

[12] Id., Exh. JCG 1, at 6.

[13] Id. at 8.

[14] See Hogan Deposition, at 22.

was not working.[15] Mr. Hogan commented that his understanding of the reason the vessel pulled into St. Thomas was to drop off the faulty alternator, which needed rewinding.[16] Mr. Hogan also indicated that the vessel did not have any fuel pump problems on the voyage south from Gibraltar to St. Thomas, nor did it have any steering gear problems. Other electrical work which might have been done in St. Thomas, according to Mr. Hogan, related to the automatic voltage regulator.[17]

Mr. Hogan stated that there were four alternators aboard the MAR, three were the same size and one was bigger. The alternator that was repaired in St. Thomas was the same one that was not working in Gibraltar and it was one of the smaller alternators. According to Mr. Hogan, the failure of the alternator had no effect on the operation of the ship and the reason why it was so important to go into St. Thomas to repair the alternator was to assure there would be backup capacity in case of another failure.[18] During cargo operations it was necessary only to have two generators running—either two of the small ones or one big one or one big one and one small one.[19] In addition to the four generators, there was also a separate emergency generator.[20] Mr. Hogan stated that the alternator was taken off the MAR in St. Thomas and returned sometime after the vessel left St. Thomas.[21] Mr. Hogan stated that he did not recall any problems with the ship during its voyage from St. Thomas to Guatemala.[22] Mr. Hogan described routine engine maintenance which was performed and, in response to questions, stated that he did not recall any engine maintenance being done when the vessel stopped in St. Thomas.[23]

---

[15] Mr. Hogan distinguished between alternators and generators, although the attorneys deposing him (and Captain Crawford in his unsworn statement) used the term generator. Mr. Hogan and the attorneys ultimately seemed to agree that they were talking about the same thing, although Mr. Hogan continued to refer to alternators and the attorneys continued to refer to generators. As used herein, the terms "alternator" and "generator" are used interchangeably and are based upon the particular references made during the deposition.

[16] See id. at 33–34.

[17] See id. at 34–35.

[18] See id. at 37–38.

[19] See id. at 60.

[20] See id. at 61.

[21] See id. at 43.

[22] See id. at 49.

[23] See id. at 62.

With regard to the voyage from the Panama Canal to Callao, Mr. Hogan stated that the vessel had problems with the fuel pump for the port engine.[24] Mr. Hogan also stated that there was a problem with the auto pilot, which he believed would not have affected the steering, on the West Coast of South America, prior to passing through the Panama Canal on the return voyage to Europe.[25]

Mr. Hogan recalled that there was leakage of water into the void space in the steering gear area while the vessel was on the west side of the Canal and that an electric submersible pump was put into the space to pump out the water. The submersible pump was used, not because of its capacity, but because the system pump was a manual one, which would have required constant attention by a crew member.[26] In addition, after leaving the last load port in South America, the port engine stopped because of a problem with the port fuel pump—a gauge showed that the fuel pump had low lube oil pressure, which indicated a problem with the fuel pump.[27] The owners had someone waiting in Balboa to repair the pump.[28] In addition, while still on the west side of the Canal the auto pilot motor was sent ashore for rewinding and it was returned to the vessel on the Atlantic side of the Canal, at Cristobal.[29]

Throughout the canal transit the port main engine problem persisted.[30] Mr. Hogan commented that it was his opinion that the vessel should not make the Atlantic crossing without the fuel pump being repaired and that he understood that the MAR was going somewhere in order to exchange the fuel pump before making the crossing.[31] The vessel put into St. Maarten for repairs to the port main engine pump.[32] Although Mr. Hogan testified initially that en route from the Canal to St. Maarten, the MAR also experienced "fuel problems with the alternators," that is "water or foreign matter" contaminating the fuel,[33] he subsequently amended

24 See id. at 65–66.
25 See id. at 71.
26 See id. at 73.
27 Id. at 74–75.
28 Id. at 78.
29 Id. at 81–82.
30 Id. at 88–89.
31 See id. at 90.
32 Id. at 91.
33 See id. at 92.

his testimony to state that the problem with the fuel oil to the diesel alternators "must have" occurred after the vessel left St. Maarten for Spain, rather than on the voyage from Panama to St. Maarten.[34] Mr. Hogan speculated that the water or foreign matter came from the fuel received or from contamination through the purifier.[35] The contamination of the fuel caused the generators to stop working or go off line; this occurred possibly two or three times and lasted for "[m]aybe half-an-hour."[36] The main engines did not experience similar problems nor did the fuel for the main engines come from the same day tank as that for the alternators; indeed the main engines and the alternators ran on different fuels.[37] Mr. Hogan also speculated that it was "most likely" that the purifier was causing the contamination.[38] According to Mr. Hogan, everything on the vessel ran off the alternators, including the steering.[39] Mr. Hogan observed, however, that any leakage still occurring in the void space in the steering gear could continue to be pumped out using the manual pump, even if the electric submersible pump was inoperative.[40]

In addition to the fuel problem with the alternators, the auto pilot problem recurred.[41] In St. Maarten, the fuel pump was replaced with a rebuilt pump.[42] Upon sailing from St. Maarten, the vessel almost immediately experienced the same problems with the fuel pump on the port main engine and the decision was made to return to St. Maarten.[43] En route back to St. Maarten, the fuel problem caused the alternators to stop working and that, in turn, caused the main engines to stop. Although the engine apparently was restarted, the vessel was towed back to St. Maarten.[44]

Mr. Hogan left the vessel when it returned to St. Maarten, but he subsequently was persuaded to return to the vessel while it was

---

[34] See id. at 114.

[35] See id.

[36] Id. at 93–94, 100.

[37] Id. at 94.

[38] See id. at 98.

[39] See id. at 100.

[40] See id. at 100–01.

[41] Id. at 104.

[42] Id. at 104–05.

[43] Id. at 108, 111.

[44] Id. at 116.

under tow and after it had begun listing.[45] Upon reboarding the vessel, Mr. Hogan found water approximately two meters high in the engine room,[46] but he was unable to determine where the water was coming from and had no opinion on where it was coming from.[47] When pressed, Mr. Hogan stated "the only opinion I have is that something gave somewhere."[48] Mr. Hogan attempted to start the big generator but was unable to get power to the starting pump. The emergency generator did start, however. In addition, Mr. Hogan started two petrol driven pumps and began pumping out the water, the level of which appeared to go down.[49] After working on the vessel for eight or nine hours, Mr. Hogan returned to the tug. When he came back to the vessel the following day more water had come in. The petrol pumps had run all night until they ran out of fuel. The emergency generator had not been left running all night and no attempt was made to start it the following morning.[50] Mr. Hogan observed that the water level "appeared to have risen" but because the vessel was "rolling much more" he was uncertain how much the level had risen.[51] Mr. Hogan speculated that the reason the MAR sank was that "[w]ater got into it" and he further stated that he did not believe "any amount of maintenance would have prevented" the various problems with the pumps and the fuel oil.[52]

## PERSONAL JURISDICTION

In Reliance Steel Products v. Watson, Ess, Marshall & Enggas, 675 F.2d 587 (3rd Cir. 1982), Judge Gibbons wrote:

> [T]here are two steps to be undertaken when personal jurisdiction is asserted over a nonresident defendant on bases other than consent, or general presence . . . . The initial determination that must be made is whether the claim or cause of action which is being pursued arises from the defendant's forum re-

---

[45] Id. at 127, 131–32.

[46] Id. at 134.

[47] See id. at 136.

[48] Id.

[49] Id. at 137–38.

[50] Id. at 144–45.

[51] Id. at 145.

[52] See id. at 166–67.

lated activities or from non-forum related activities. The focus must be on the relationship of the transaction giving rise to the law suit to the forum where the plaintiff seeks to litigate it.

If the claim pursued arises from forum related activity, the court must determine whether there are enough contacts with the forum arising out of *that* transaction in order to justify the assertion of jurisdiction over the out-of-state defendant.

Reliance Steel, 675 F.2d at 588 (emphasis original) (citations omitted).

The Virgin Islands has two statutory provisions governing personal jurisdiction. Title 5, section 4902 of the Virgin Islands Code provides for general jurisdiction, or jurisdiction based upon an "enduring relationship." Section 4903 provides for specific jurisdiction, or jurisdiction based upon conduct. Plaintiffs rely only upon Section 4903(a)(3) which provides as follows:

A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's

(3) causing tortious injury by an act or omission in this territory . . . .

V.I. Code Ann. tit. 5, § 4903(a)(3). Plaintiffs do not claim that any of the other jurisdictional provisions of the statute apply.

■ When a defendant challenges personal jurisdiction, the burden is upon the plaintiff to make a prima facie showing that jurisdiction exists. See Compagnie des Bauxites de Guinea v. Insurance Co. of North America, 651 F.2d 877, 880–81 (3rd Cir. 1981). The plaintiff cannot "simply rest on the bare allegations of its complaint, but rather [is] obligated to come forward with facts, by affidavit or otherwise, supporting personal jurisdiction." Amba Marketing Sys., Inc. v. Jobar Int'l, Inc., 551 F.2d 784, 787 (9th Cir. 1977). In Madara v. Hall, 916 F.2d 1510 (11th Cir. 1990), the Court framed the inquiry to be made as follows:

A prima facie case is established if the plaintiff presents enough evidence to withstand a motion for directed verdict. The district court must accept the facts alleged in the complaint as true, to the extent they are uncontroverted by the defendant's affidavits. Finally, where the plaintiff's complaint and the defendant's affidavits conflict, the court must construe all reasonable inferences in favor of the plaintiff.

260

Id. at 1514 (citing Morris v. SSE, Inc., 843 F.2d 489, 492 (11th Cir. 1988)) (citations omitted).

Plaintiffs assert that based upon the sinking of the MAR in relatively calm seas and confirmed by the observations of Captain Crawford and Chief Engineer Hogan, Achille failed to exercise due diligence to make the MAR seaworthy. According to plaintiffs, the MAR had "open and obvious" problems which worsened during the voyage from Italy to Chile and, as a consequence, it was necessary to divert the MAR to St. Thomas for repairs. Plaintiffs assert that the MAR was not fully or properly repaired in the Virgin Islands, that the generators were repaired at St. Thomas and "evidently an effort was made to solve the fuel pump problem, [n]either repair effort was adequate," and that the generator problems supposedly remedied in St. Thomas later resurfaced.

A careful reading of the affidavits, however, does not support plaintiffs' assertions. By the deposition testimony of Mr. Hogan and the statement of Captain Crawford, it is established only that the MAR diverted to St. Thomas to address a problem with "the generators" or one of the three smaller "alternators." Contrary to plaintiffs' assertion, no evidence has been presented that the fuel pumps were repaired or in any way worked upon while the MAR was in port at St. Thomas. As for the generators, Captain Crawford stated that they were "okay" en route from St. Thomas to Guatemala. Further, according to Mr. Hogan's testimony, the problem with the generators (or alternators) was contamination of the fuel used to power the generators. Although the source of the contamination could have been either the fuel itself or the purifier used to filter the fuel, Mr. Hogan expressed his view that the purifier was the "most likely" source of contamination. In any event, even assuming the fuel itself was contaminated when it was loaded, there is no evidence that this fuel was taken on in St. Thomas. In fact, Mr. Hogan testified that he did not believe *any* bunkers were taken on in St. Thomas.

■■ Plaintiffs correctly assert that Achille, as a carrier, owed to plaintiffs a duty to use due diligence to make the vessel seaworthy. See Lauro Lines, General Carriage Terms and Conditions, Art. 15; see also 6 Benedict on Admiralty, Doc. 1-1, at 1-3 (Michael M. Cohen et al. eds. 1991). While it may be that plaintiff has presented a prima facie case that the vessel was not seaworthy, that does not constitute a prima facie showing that the tortious injury alleged by

261

plaintiffs resulted from any act or any omission which took place in the Virgin Islands.

> To become liable to another under the principles of the law of Torts, an actor's conduct must not only be tortious in character but it must also be a legal cause of the invasion of another's interest. In order that a particular act or omission may be the legal cause of an invasion of another's interest, the act or omission must be a substantial factor in bringing about the harm . . . .

Restatement (Second) of Torts, § 9 cmts. a & b.[53] Although Captain Crawford offered no explanation as to the cause of the MAR's sinking and Mr. Hogan only speculated that it sank because water got in as a result of "something [giving] somewhere," plaintiffs seemingly assert that the vessel sank because the generators were not working—and they were not working because they were negligently repaired in St. Thomas. Based on the evidence presented, however, there is no indication that the failure of the generators—as such—was the cause of the vessel's sinking. Indeed, the emergency generator was working. Even if the generator problems were ultimately the cause for the "dead" tow and the "dead" tow caused the sinking, the evidence proffered demonstrates that the problem was not with the generators themselves but with the fuel used to power the generators. The plaintiffs have presented no evidence demonstrating a linkage between the contaminated fuel and the repair in St. Thomas of either one small generator or possibly all of the generators.

In sum, plaintiffs have not presented a prima facie case that anything—negligently or otherwise—done while the MAR was in St. Thomas was the proximate cause of the sinking. But even if the contrary be assumed and even if the long-arm requirements of the Virgin Islands statute are deemed met, there remains the question of whether plaintiffs have presented a prima facie case of sufficient contacts of defendant Achille with the forum. "'The constitutional touchstone' of the determination whether an exercise of personal jurisdiction comports with due process 'remains whether the defendant purposefully established 'minimum contacts in the forum State.'"" Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 108

---

[53] The principles of the Restatement govern in the Virgin Islands in the absence of local statutory or case law to the contrary. V.I. Code Ann. tit. 1, § 4.

(1987) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985)). In Asahi, the Supreme Court enumerated several factors which a court must consider in determining the reasonableness of exercising personal jurisdiction: "A court must consider the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief." Asahi, 480 U.S. at 113.

The defendants in Asahi were a Taiwanese tire tube manufacturer (Cheng Shin) and a Japanese tube valve assembly manufacturer (Asahi). The plaintiff was a California resident who had been injured when the rear tire of his motorcycle exploded when plaintiff was riding the vehicle in California. The California plaintiff settled with the defendants, leaving pending only Cheng Shin's indemnity action against Asahi. The question before the Court was whether California could constitutionally exercise personal jurisdiction over Asahi. In concluding that the exercise of personal jurisdiction was inappropriate, the Court wrote:

> Certainly the burden on the defendant in this case is severe. Asahi has been commanded by the Supreme Court of California not only to travel the distance between Asahi's headquarters in Japan and the Superior Court of California . . . but also to submit its dispute with Cheng Shin to a foreign nation's judicial system. The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders.
>
> When minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant. In the present case, however, the interests of the plaintiff and the forum in California's assertion of jurisdiction over Asahi are slight. . . . The transaction on which the indemnification claim is based took place in Taiwan; Asahi's components were shipped from Japan to Taiwan. Cheng Shin has not demonstrated that it is more convenient for it to litigate its indemnification claim against Asahi in California rather than in Taiwan or Japan.
>
> Because [Cheng Shin] is not a California resident, California's legitimate interests in the dispute have considerably diminished. . . . Moreover, it is not at all clear at this point that California law should govern the question whether a Japanese

corporation should indemnify a Taiwanese corporation on the basis of a sale made in Taiwan and a shipment of goods from Japan to Taiwan.

*Asahi,* 480 U.S. at 114–15 (citations omitted).

Certain of the considerations present in Asahi exist in this case. The plaintiffs are foreign as is defendant Achille. The dispute concerns the loss of goods which originated in Peru and Chile and were bound for Europe; neither the plaintiffs nor their goods have any connection with the forum. However, the vessel on which the plaintiffs' goods were loaded did make a brief stop in St. Thomas several weeks before the plaintiffs' goods were loaded. In Asahi, the plaintiff was a Californian and the accident took place in California. Thus, in this case, even if plaintiffs have made a prima facie showing that their suit against Achille meets the Virgin Islands' long-arm statutory requirements—a conclusion which this Court rejects—nevertheless, exercise of such long-arm jurisdiction in this case might well offend the federal Constitution's due process requirements under the standards enunciated in Asahi. However, this Court need not decide that issue in view of plaintiffs' failure to pass muster under the Virgin Islands' long-arm statute.

## FORUM SELECTION CLAUSE

Achille argues, as an alternative ground in support of its quest for dismissal of plaintiff's complaint, that the bills of lading accompanying the shipment of plaintiffs' goods contain a forum selection clause which requires that all disputes concerning the goods be litigated in Italy. Plaintiffs, responding to that contention, urge that the forum selection clause does not by its terms apply to Achille but that, even if it applies to Achille, the clause is invalid because it violates the requirements of the Hague Rules governing negotiable bills of lading, as interpreted by American courts.

The forum selection clause reads as follows:

Art. 30—Any legal proceedings which shippers, receivers or their agents may deem fit to take in respect of the *owner or master or their agents* on the basis of this bill of lading will have to be pursued before the Italian Law Court in Naples, it being hereby mutually agreed and established that no other court or tribunal will be competent to act and decide on controversies

arising under the terms and scope of this bill of lading which is issued with this precise reserve.[54]

Plaintiffs point to the specific language "owner or master or their agents" and argue that Achille, as the sub-charterer, was neither the owner of the MAR, nor its Master, nor the agent of the owner or master. Plaintiffs assert that Achille cannot be regarded as the owner's agent because the owner acted as Achille's agent in performing a portion of Achille's obligations as a carrier. In support of those contentions, plaintiffs note the general rule that contract terms are strictly construed against their drafter, see Bouton v. Litton Indus., Inc., 423 F.2d 643, 647 (3rd Cir. 1970), and argue that that rule applies with particular force to standard form contracts, such as Achille's bills of lading, see Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1207 (2d Cir. 1970). In response, Achille contends that the forum selection clause should not be literally applied because plaintiffs have in no way relied on the fact that Achille was acting as a charterer rather than an owner when plaintiffs or their predecessors in interest accepted the terms of the bills of lading. In addition, under the Hague Rules and the United States' codification of those rules, that is, the Carriage of Goods by Sea Act (COGSA), the term "carrier" includes both an owner and a charterer "who enters into a contract of carriage with a shipper." 46 U.S.C. § 1301(a). Achille further takes the position that it has always asserted that the Master was Achille's agent with regard to matters pertaining to the bills of lading, that the plaintiff' claims relate to cargo covered by the bills of lading, and that the forum selection clause applies specifically to disputes involving the bills of lading.

Section 206 of the Second Restatement of the Law of Contracts provides: "In choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing othervise proceeds." Comment a, which addresses the rationale of the rule, states that the party drafting a particular provision is likely to have protected his own interests rather than those of the other party and is presumed to know of uncertainties of meaning. Id. Thus, the concern that this rule ad-

---

[54] Memorandum in Support of Achille's Motion to Dismiss due to Forum Selection Clause, Exh. J. (emphasis added).

dresses is one of potential unfairness or disadvantage to the non-drafting party. In this case, as Achille points out, it should have made no difference to the shippers whether Achille was the ship owner or merely the charterer—thus, there appears to be no disadvantage to the plaintiffs.

■ In addition, Section 203(a) of the Restatement provides:

In the interpretation of a promise or agreement or a term thereof, the following standards of preference are generally applicable:

(a) an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect
. . . .

Id. at § 203(a). In this case, the forum selection clause referred to disputes involving the bills of lading. Achille, as the subcharterer, and the vessel's Master, were immediately responsible for the cargo covered by the bills of lading. Plaintiffs seemingly have not named the vessel's Master, Captain Crawford, as a defendant. However, to construe the forum selection clause as narrowly as plaintiffs suggest would deprive Achille of the benefit of the forum selection clause and would render that clause of no effect, with regard to Achille, in violation of the principles of the Restatement.[55]

Plaintiffs further argue that even if Achille is a proper party to invoke the forum selection clause, that clause is invalid as a matter of public policy because it violates the Hague Rules, which were designed to achieve uniformity and simplification of bills of lading used in international trade. According to plaintiffs, because the goods to which the bills of lading applied were loaded in Peru and Chile, the laws of Peru and Chile compulsorily are applicable to the bills of lading involved in this litigation. See, e.g., Grant Gilmore & Charles L. Black, supra n.1 § 3-19, at 130 ("In actions against the carrier for negligent stowage or care of the goods during transit, conflict of laws principles would lead to the law of the jurisdiction in which the bill was issued."). Plaintiffs then argue that Peru, having adopted the Hague Rules, and Chile, having adopted the conceptually similar Hamburg Rules, would invalidate the forum

---

[55] See V.I. Code Ann. tit. 1 § 4.

selection clause. Plaintiffs base their argument on the judicial con-
struction of COGSA, which is the United States' version of the
Hague Rules, and which, according to the decisions of a number of
American courts prohibit the use of forum selection clauses in bills
of lading.

Neither the Hague Rules nor the Hamburg Rules specifically in-
validate forum selection clauses. Rather, the language which has
been the subject of judicial construction is Article 3(8) of the Hague
Rules:

> Any clause, covenant, or agreement in a contract of carriage
> relieving the carrier or the ship from liability for loss or dam-
> age to, or in connexion with, goods arising, from negligence,
> fault, or failure in the duties and obligations provided in this
> Article or lessening such liability otherwise than as provided
> in this Convention, shall be null and void and of no effect. A
> benefit of insurance in favour of the carrier or similar clause
> shall be deemed to be a clause relieving the carrier from lia-
> bility.

6 Benedict on Admiralty Doc. 1-1, at 1-4 (Michael M. Cohen et al.
eds. 1991). It is true that a number of courts in the United States, in
construing COGSA, have indicated that under general circum-
stances forum selection clauses violate Article 3(8). See State Estab-
lishment for Agric. Prod. Trading v. M/V Wesermunde, 838 F.2d
1576, 1580–81 (11th Cir. 1988); Union Ins. Soc'y of Canton, Ltd. v.
S.S. Elikon, 642 F.2d 721, 724–25 (4th Cir. 1981); Indussa Corp. v.
S.S. Ranborg, 377 F.2d 200, 203–04 (2d Cir. 1967).

In 1972, the Supreme Court in M/S BREMEN v. Zapata Off Shore
Co., 407 U.S. 1, 10–11 (1972), held that parties to a contract are free
to include forum selection clauses in their contracts and that such
clauses are prima facie valid. Indeed, Chief Justice Burger, in re-
versing the Fifth Circuit, wrote in the BREMEN: "Thus, in the light
of present-day commercial realities and expanding international
trade we conclude that the forum clause should control absent a
strong showing that it should be set aside." Id. at 15. The BREMEN
did not involve a COGSA claim, as the Court explicitly acknowl-
edged. In addition, the Court stressed the arms' length nature of
the contract negotiation between a German based company which
agreed to tow the drilling rig of plaintiff, an American corporation
headquartered in Houston, Texas, from Louisiana to the Adriatic
coast of Italy. The contract provided that "[a]ny dispute arising
must be treated before the London Court of Justice." Id. at 2.

In Indussa, 377 F.2d at 203, which predated the BREMEN, a New York corporate consignee of cargo brought suit against a Norwegian ship. Judge Friendly, declining, in a case governed by COGSA, to enforce a forum clause conferring exclusive jurisdiction upon the courts of Norway, wrote that:

> [f]rom a practical standpoint, to require an American plaintiff to assert his claim only in a distant court lessens the liability of the carrier quite substantially, particularly when the claim is small. . . . A clause making a claim triable only in a foreign court would almost certainly lessen liability if the law which the court would apply was neither the [COGSA] nor the Hague Rules. . . . We think that Congress meant to invalidate any contractual provision in a bill of lading for a shipment to or from the United States that would prevent cargo able to obtain jurisdiction over a carrier in an American court from having that court entertain the suit and apply the substantial rules Congress had prescribed.

Id. at 203–04 (citations omitted). In its opinion in Union Insurance, handed down after the BREMEN, Judge Winter held to the Fourth Circuit's earlier view that a forum selection clause lessens a carrier's liability and thus conflicts with Article 3(8) of COGSA:

> While the BREMEN holds that forum selection clauses are presumptively valid, particularly in international transactions, it only expressed this view in the absence of any congressional policy on the subject, much less a contrary congressional policy. . . . The terms of the bill [of lading] were not agreed to through hard bargaining, but rather represent the form clauses of an adhesion contract. Congress intended COGSA to ameliorate this very difficulty of bills of lading with one-sided form provisions. . . . The district court erred in declining jurisdiction in this case solely on the basis of the foreign forum selection clause in the bills of lading.

Union Ins. Soc'y of Canton, Ltd. v. S.S. Elikon, 642 F.2d at 724–25 (citations omitted). In that case, the plaintiff was "a marine insurer incorporated under the laws of a country other than the United States," id. at 722, which had "paid a substantial claim to the Middle Eastern consignee of the cargo," id., shipped by General Electric Company and manufactured by the latter in Kentucky. The defendant ship was German owned. The bills of lading "provided

that the laws of the Federal Republic of Germany would apply . . . ." Id.

In Wesermunde, Judge Owens traced the legislative history and judicial construction of COGSA, which history is applicable in this case:

> COGSA represents the American enactment of the Hague Rules, developed at a series of international maritime conferences in the 1920's. It was promulgated as part of an international effort to achieve uniformity and simplification of bills of lading used in international trade. COGSA was also intended to reduce uncertainty concerning the responsibilities and liabilities of carriers, the responsibilities and rights of shippers, and the liabilities of underwriters who insure waterborne cargo. By strictly circumscribing the ability of carriers to avoid liability on cargoes in their care, COGSA also greatly enhances the negotiability of bills of lading.
>
> Of most relevance to the issue at bar is the statute's power to void overreaching clauses inserted by carriers in their bills of lading that unreasonably limit the carrier's liability or obstructs the freight claimant's ability to secure redress. In providing this latter protection, courts have found contractual language requiring a consignee to litigate claims against the carrier in a foreign forum under foreign law to be ineffective because such provisions, as a practical matter, tend to lessen the liability of the carrier, particularly where the claim is small.

M/V Wesermunde, 838 F.2d at 1580–81 (citations omitted). In that case, the plaintiff, apparently Florida based, shipped a cargo of fresh eggs from Florida bound for Jordan. The ship, one of the defendants, was a "vessel of foreign registry." Id. at 1578. The charter party called for "'[a]ny dispute arising'" under it "'to be settled by arbitration in London'". Id. (quoting ¶ 34 of the Charter party agreement).

As above discussed, since the BREMEN was decided, two Circuit Courts have held forum selection clauses void in cases in which COGSA was applicable because such clauses were intended to limit the liability of the carrier. However, only last year, that is, after the Eleventh Circuit's 1988 decision in Wesermunde and after the Fourth Circuit's decision in Union Insurance, the Supreme Court refined its BREMEN analysis in order to apply it to "the realities of form passage contracts." Carnival Cruise Lines, Inc. v.

269

Shute, 111 S. Ct. 1522, 1527 (1991). In upholding the validity of a forum selection clause contained in provisions on the back of a passage ticket against the challenge of a cruise ship passenger who was suing for injuries allegedly incurred by that passenger aboard ship, Justice Blackmun stated the following:

> Including a reasonable forum clause in a form contract of this kind well may be permissible for several reasons: First, a cruise line has a special interest in limiting the fora in which it potentially could be subject to suit. . . . Additionally, a clause establishing ex ante the forum for dispute resolution has the salutary effect of dispelling any confusion about where suits arising from the contract must be brought and defended, sparing litigants the time and expense of pretrial motions to determine the correct forum, and conserving judicial resources that otherwise would be devoted to deciding those motions.
>
> . . . .
>
> It bears emphasis that forum-selection clauses contained in form passage contracts are subject to judicial scrutiny for fundamental fairness. In this case, there is no indication that petitioner set Florida as the forum in which disputes were to be resolved as a means of discouraging cruise passengers from pursuing legitimate claims. Any suggestion of such a bad-faith motive is belied by two facts: petitioner has its principal place of business in Florida, and many of its cruises depart from and return to Florida ports. Similarly, there is no evidence that petitioner obtained respondents' accession to the forum clause by fraud or overreaching.

Carnival Cruise Lines, 111 S. Ct. at 1527–28. In Carnival plaintiffs, wife and husband, apparently residents of the state of Washington, purchased through a travel agent in their home state, cruise tickets on a ship owned by a Florida headquartered company. The tickets contained a provision stating that:

> all disputes and matters whatsoever arising under, in connection with or incident to this contract shall be litigated, if at all, in and before a Court located in the State of Florida, U.S.A., to the exclusion of the Courts of any other state or country.

Id. at 1524. Thus, the Supreme Court has recognized that a forum selection clause is not necessarily intended to limit substantively a party's liability, but sometimes is apparently aimed primarily at

providing predictability and order to a party's activities. As in Carnival, Achille has chosen its home country as the forum for litigation—not some forum which has no connection with the shipment of plaintiffs' goods. Significantly, Italy has enacted an amended version of the Hague Rules which plaintiffs argue should apply, i.e., Italy has enacted the Hague Visby Rules. Compare Indussa, 377 F.2d at 203.

 Plaintiffs have asserted also that American courts' interpretations of COGSA and the Hague Rules should govern with respect to the validity of forum selection clauses, rather than the interpretations of similar provisions in the Hague Rules, or other Rules, under the law of another country. In this case, the parties have not briefed the choice of law issues regarding whether the laws of Peru or Chile, the countries of the shippers, would be applied by an American Court, or an Italian Court, or a Court of Peru or of Chile. Further, whether the laws of Italy, Peru or Chile will be applied to require results other than those called for by COGSA is not revealed by the record in this case. Plaintiffs assert that the laws of Peru and/or Chile govern, in this case, at least with regard to the question of the forum selection clause's validity. However, under Rule 44.1 of the Federal Rules of Civil Procedure, a party which intends to raise an issue concerning the law of a foreign country is required to give written notice of that intent. No such notice has been given in this case. This Court is under no obligation to require applicability of foreign law; nor is this Court under any obligation "to examine foreign law on its own". Carey v. Bahama Cruise Lines, 864 F.2d 201, 205 (1st Cir. 1988). Rather, when none of the parties have availed themselves of Rule 44.1, American courts have applied the law of the forum or, in the absence of authority to the contrary, have assumed that the law of the foreign sovereign is the same as that of the forum state. Id. However, that general approach is subject to the caveat that a "court should not apply forum law if the forum 'has no significant contacts, or significant aggregation of contacts, . . . with the parties and the occurrence or transaction.'" Id. at 206 (quoting Allstate Ins. Co. v. Hague, 449 U.S. 302 (1981)). As already indicated, in this case, in this Court's view, the Virgin Islands has minimal contacts with the dispute involved. Plaintiffs, when they assert the applicability of Peruvian and Chilean law, have the burden to apprise this Court of the content of that law and may not assume that the judicial construction of COGSA by Ameri-

271

can courts bears or does not bear in any way upon the views of the courts of Peru or of Chile or of Italy as to the validity of forum selection clauses in bills of lading, generally, or the clause at issue in this litigation.

Finally, even if it be assumed arguendo that American judicial construction of COGSA should govern in this case, the Supreme Court's view enunciated in Carnival calls into question earlier judicial views that forum selection clauses invariably tend to lessen a carrier's liability so as to violate Article 3(8). Particularly in the present case where Italy—as the forum selected—is the home of the carrier and the destination of some of the goods covered by the bills of lading and is a jurisdiction which has enacted rules similar to those which plaintiffs argue should apply, there would appear little, if any, reason why that forum selection clause set forth in the bills of lading should not be held valid and applicable.

## CONCLUSION

Because this Court concludes that personal jurisdiction is lacking over the defendant Achille and, alternatively, that the forum selection clause in the bills of lading is applicable and valid, Achille's quest for dismissal of plaintiff's complaint against it and judgment in its favor, because of lack of jurisdiction will be granted in a separate Order of even date herewith.